**UNITED STATES of America, Plaintiff,**

v.

**CONSOLIDATED COAL COMPANY
et al., Defendants.**

**Crim. No. 2–75–97.**

United States District Court,
S. D. Ohio, E. D.

May 6, 1976.

Robert Courtney, Richard I. Chaifetz, Dept. of Justice, Washington, D. C., for plaintiff.

William J. Melvin, Richard C. Addison, William J. Abraham, Jerry Weiner, James DeLeone, Columbus, Ohio, Roger Curran, Pittsburgh, Pa., David Smith, Washington, D. C., Stephen M. Stern, Steubenville, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

The defendants, Consolidated Coal Company (hereinafter "Consol") and eight of its agents and employees[1] are variously charged in a 172-count indictment with conspiring to defraud the government and to violate the Federal Coal Mine Health and Safety Act in violation of 18 U.S.C. § 371;[2] with knowingly making false statements and representations in "mine data cards" filed with the Department of the Interior in

---

1. The named individual defendants are: Darrell Hazelwood, Francis Leo Marks, Raymond J. Zitko, Robert Lasick, Richard Schrickel, Samuel Kirkland, Paul R. Kidney, and James Kull.

2. 18 U.S.C. § 371 provides as follows:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

violation of 30 U.S.C. § 819(d);[3] with willfully violating specified mandatory health standards in violation of 30 U.S.C. § 819(b);[4] and with knowingly authorizing, ordering, and carrying out violations of the mandatory health standards by Consol in violation of 30 U.S.C. § 819(c).[5] On September 12, 1975, the defendants entered pleas of not guilty to all counts; thereafter, all but one of these defendants[6] filed motions to dismiss as to some or all of the counts relating to them. All of the various contentions raised in these motions are discussed hereinbelow.

I. Conspiracy Question: Can A Corporation Be Charged and Convicted of Conspiring Solely with Its Own Employees?

▮ Counts I and II of the indictment charge the defendants with violations of the conspiracy statute as set forth in 18 U.S.C. § 371. Count I alleges a conspiracy to defraud the United States of its right to have the dust sampling program administered in accordance with the Federal Coal Mine Health and Safety Act, specifically with the provisions of sections 814(i) and 842 of Title 30, United States Code, and the rules and regulations thereunder. Count II alleges that defendants conspired to violate 30 U.S.C. §§ 819(b) and 819(d). In each count it is alleged that the individual defendants were employees of Consol at the time of their participation in the conspiracy. Consol submits that a corporation may not be charged or convicted of conspiring solely with its own employees. In support of its contention the company cites a host of civil conspiracy cases involving antitrust actions under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and several cases alleging conspiracies to cause a breach of a contract. Although this Court is willing to recognize for purposes of this motion a general principle that a corporation cannot conspire with its officers or agents to violate antitrust laws, I believe that this principle arises from the restraint of trade concept of the Sherman Act and consequently that these civil Sherman Act cases are inapposite to the case at bar. Also inapplicable are civil cases involving alleged conspiracies to induce a breach of contract. As Mr. Justice Harlan observed in his concurring opinion in *United States v. Wise*, 370 U.S. 405, 417, 82 S.Ct. 1354, 1362, 8 L.Ed.2d 590 (1962):

> [T]he fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a shield against criminal prosecutions . . ..

Finally, the Court does not believe that *United States v. Carroll*, 144 F.Supp. 939

---

**3.** 30 U.S.C. § 819(d) states:
 Whoever knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained pursuant to this chapter or any order or decision issued under this chapter shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both.

**4.** 30 U.S.C. § 819(b) states:
 Any operator who willfully violates a mandatory health or safety standard, or knowingly violates or fails or refuses to comply with any order issued under section 814 of this title, or any order incorporated in a final decision issued under this subchapter, except an order incorporated in a decision under subsection (a) of this section or section 820(b)(2) of this title, shall, upon conviction, be punished by a fine of not more than $25,000, or by imprisonment for not more than one year, or by both, except that if the conviction is for a violation committed after the first conviction of such operator under this chapter, punishment shall be by a fine of not more than $50,000, or by imprisonment for not more than five years, or by both.

**5.** 30 U.S.C. § 819(c) states:
 Whenever a corporate operator violates a mandatory health or safety standard or knowingly violates or fails or refuses to comply with any order issued under this chapter or any order incorporated in a final decision issued under this chapter, except an order incorporated in a decision issued under subsection (a) of this section or section 820(b)(2) of this title, any director, officer, or agent of such corporation who knowingly authorized, ordered, or carried out such violation, failure, or refusal shall be subject to the same civil penalties, fines, and imprisonment that may be imposed upon a person under subsections (a) and (b) of this section.

**6.** Defendant Samuel Kirkland has not filed any pretrial motions.

(S.D.N.Y.1956), a criminal case also cited by Consol, in which the court refused to find a conspiracy between a corporate defendant and an individual defendant, is determinative. Rather than espousing a general rule that corporations cannot conspire with its employees, the court in *Carroll* appeared to make a narrow finding based on the particular facts involved. In *Carroll* a corporation, Sheba Bracelets, Inc., was charged with conspiring with its agent, Robert Carroll, to use and acquire gold so as to violate the federal gold laws. The court noted that no evidence was presented regarding the ownership of Sheba, but it did find that it was dominated by Carroll. Although in his ruling District Judge Palmieri discussed civil antitrust conspiracy cases, the gist of his decision seems to be his unwillingness, under the facts presented, to "over-extend the fiction of corporate personality." *United States v. Carroll, supra* at 941. Judge Palmieri explained his decision thusly:

> The purpose behind not merging conspiracy into a completed crime, as happens with attempts, is separately to penalize and to deter criminal organization, an evil quite apart from the substantive delicts which more likely than not result from such organization. This purpose is served by holding combinations of corporations and often combinations of directors of one corporation, guilty of conspiracy. . . . However, the policy does not apply when one man uses a corporate form to carry out his crime. There is no organization and no one other than the sole criminal to deter or punish. In effect, a man would be more severely punished if he chose to commit his crime by using a corporate form than he would be if he committed it through another business device.

I conclude that the *Carroll* decision must be read in light of its facts and limited to them.

In researching this issue the Court did not find any case which analyzed the precise question presented herein. However, some indication as to a proper outcome can be had by implication from cases dealing with criminal conspiracies. In *United States v. Wise,* 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962), a corporation and one of its officers were indicted for engaging in a conspiracy to eliminate price competition in the sale of milk in the Kansas City area in violation of § 1 of the Sherman Act. The Supreme Court considered the question of whether a corporate officer could be prosecuted along with the corporation when he is acting solely in his capacity as an officer, director or agent of the corporation. In answering in the affirmative, the Court stressed the language of § 1 which imposes criminal sanctions upon "every person"; a corporate officer remains a person within the statutory language even if his acts are also chargeable to his corporation. Moreover, it is clear that the term "person" within the meaning of 18 U.S.C. § 371 also includes corporations.

In *Alamo Fence Company of Houston v. United States,* 240 F.2d 179 (5th Cir. 1957) a corporation and various of its officers and employees were charged with a conspiracy in violation of § 371 and with the making of false statements to the Department of Housing and Urban Development. In considering the applicability of these statutes to a corporation which had subsequently been dissolved, the court stated:

> No contention is made, or can reasonably be made, that the federal statutes involved are not directed against corporate misconduct. *"Whoever"* commits the inhibited acts is covered by Section 1010, while Section 371 refers to a conspiracy of "two or more *persons*." The context of neither statute indicates any meaning other than that a "corporation" is included in accordance with 1 U.S.C.A. § 1.[7]

---

**7.** Section 1 of Title 1, U.S.C. states in pertinent part:

In determining the meaning of any Act of Congress, unless the context indicates otherwise—

    \*    \*    \*    \*    \*    \*

the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

In *United States v. Sherpix,* 168 U.S.App. D.C. 121, 512 F.2d 1361 (1975), the government argued that a corporation could be held criminally responsible for the acts of its officers and thus could be charged with their conspiracies. While finding that the allegations of the particular indictment were insufficient to charge a conspiracy against the corporation, the Circuit Court did, however, note that it believed the government's argument was correct. *United States v. Sherpix,* 512 F.2d at 1367, n.7.

Finally, although not discussing the issue presented herein, a number of cases have implicitly recognized that a corporation can be prosecuted for conspiring with its corporate personnel. See *e. g., Nye & Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *Baker v. United States,* 393 F.2d 604 (9th Cir. 1968); *United States v. Bridell,* 180 F.Supp. 268 (N.D.Ill.1960); *United States v. Kemmel,* 160 F.Supp. 718 (M.D.Pa.1958).

Obviously, a corporation is within the statutory language of "person" and can operate only through its agents. However, employment alone by a corporation does not so merge the employee's mind and being with that of the corporation so that one person's cognition remains rather than more than one. When separate individual judgments and decisions are capable of being made by both a corporation and one or more of its employees, there is a vast dissimilarity to the facts of *Carroll* in which one man used the corporate form to commit a criminal act. The Court concludes then that a corporation can be charged with con-

spiring with its corporate personnel. The motion of Consol to dismiss on this ground is therefore denied.

II. Whether a Violation of 30 U.S.C. § 819(d) Has Been Properly Alleged in the Indictment.

Defendants [8] attack counts 3–13 and 172–174 of the indictment which charges them with violations of 30 U.S.C. § 819(d) for knowingly making false statements and representations in mine data cards. This section provides that:

> whoever knowingly makes any false statement, representation, or certification in any application, record, report, plan or other document filed or required to be maintained *pursuant to this chapter or any order or decision issued under this chapter* shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months, or both. (Emphasis added.)

Defendants contend that nowhere in Chapter 22, referred to in the emphasized portion of § 819(d), is there a section providing that a mine data card is a record, report, or other document filed or required to be maintained thereunder. They argue that since the filing of a coal mine dust sampling cassette is required by the Act but the filing of a mine data card is required only by regulation,[9] criminal liability can only attach if a person makes a false statement or representation on or in the cassette. The Court believes, however, that such an interpretation is unnecessarily artificial and overly restrictive.

---

**8.** This ground for dismissal is made by defendants Consol, Schrickel, Lasick and Kidney.

**9.** Part 70 C.F.R. § 70.260 sets forth the procedures for transmission of the respirable dust samples as follows:

> (a) At the conclusion of each production shift in a sampling cycle, the operator shall promptly collect and transmit all samples in a container provided by the manufacturer of the filter to:

> Pittsburgh Health and Safety Technical Support Center, Mining Enforcement and Safety Administration, Department of the Interior, Pittsburgh, Pa. 15213.

> (b) Each sample shall be accompanied by a completed 3 × 5 inch white data card identical to the card contained in Figure 1 of this Part 70, provided for this purpose by the cassette manufacturer. The card shall have an identification number identical to that on the cassette used to take the sample, and the name and Social Security number of the miner whose environment was being sampled. The data card shall be initialed by the miner whose environment was being sampled and the representative of the company responsible for the dust sampling procedure.

Section 842(a) requires each operator of a coal mine to take accurate dust samples and to transmit them to the Secretary of the Interior. This same section further provides that "[s]uch samples shall be transmitted . . . in a manner established by [the Secretary] and analyzed and recorded by him in a manner that will assure application of the provisions of section 814(i) . . ." The Act then directs the Secretary to establish a method or system for the taking of dust samples and bestows upon the system the same force and effect as if it were written into the Act by Congress itself.

Moreover, § 819(d) applies to all records filed or required to be maintained by the Act. If the Act itself grants to the Secretary the authority to require the keeping of a record then the Court believes that it can be said that the Act itself requires the keeping of any record authorized by the Secretary. Section 821(b) of Title 30 states:

> In addition to such records as are specifically required by this chapter, every operator of a coal mine shall establish and maintain such records, make such reports, and provide such information, as the Secretary may reasonably require from time to time to enable him to perform his functions under this Act.

I believe that a mine data card is a report which the Secretary could reasonably require in order to perform his functions under the Act. Certainly, this is true in light of the nature of the cassette used to collect and transmit the respirable dust samples required by § 842. The cassette is merely a piece of paper encased in plastic. By its very nature it does not allow for the writing of pertinent information, such as the name of the company forwarding the sample or the area of the mine from which it is being taken, information without which the cassette would be meaningless. Since under the Act the Secretary is responsible for the manner in which dust samples are

transmitted to him and may further require such reports as are necessary to enable him to obtain the dust samples, I conclude that § 819(d) properly applies to mine data cards. Accordingly, this ground for defendants' motion to dismiss is denied.

III. Whether Counts 16–170 Fail to Charge an Offense Under 30 U.S.C. § 819(b) by Failing to Allege a Willful Violation by a Corporate Officer, Agent, or Employee Who Meets the Statutory Definition of "Operator" in the Federal Coal Mine Health and Safety Act.

Counts 16–171 allege violations of certain mandatory health standards set forth in 30 U.S.C. § 842(a) and certain implementing regulations found in 30 C.F.R. Part 70. The even-numbered counts charge the corporate defendant pursuant to 30 U.S.C. § 819(b) with willfully violating these provisions while the odd-numbered counts charge various individual defendants pursuant to 30 U.S.C. § 819(c) with knowingly authorizing, ordering or carrying out violations of these provisions. Defendant Consol [10] contends that the counts against it must fail because there is no allegation that a person meeting the statutory definition of "operator" committed the alleged willful violations.

Section 819(b) provides in relevant part that:

> Any operator who willfully violates a mandatory health or safety standard . . . shall, upon conviction, be punished, . . . .

Essentially Consol's argument proceeds as follows: (1) A corporation can only be vicariously liable; that is, it can only be made liable by acts of its corporate personnel. (2) However, contrary to the civil penalties of § 819(a) where *any* employee's violations can result in corporate liability, the actions of only certain types of agents or employees

---

10. This ground for dismissal is also put forth by defendant Zitko, who contends that if the even-numbered counts are defective, then the odd-numbered counts, in which he is named and which incorporate the even-numbered

counts are also defective. Since the same assertions are made by Zitko as are made by Consol, the government has treated this as a single motion and the Court will do likewise.

should subject the corporation to criminal sanctions. (3) This type of employee or agent should be one meeting the definition of "operator" set forth in § 802(d)—an "owner, lessee, or other person who operates, controls, or supervises a mine."

Consol relies upon *United States v. Consolidation Coal Company,* 504 F.2d 1330 (6th Cir. 1974) for support of the above-argument. The Court does not believe this reliance is well-placed. *United States v. Consolidation Coal Company* involved the reversal of the conviction of an individual defendant (Kidd) on the ground of insufficient evidence and the conviction of a corporate defendant because of an error in the trial court's instruction on willfulness. The Court simply does not read the opinion as approving Consol's contention that only persons meeting the statutory definition of operator can criminally bind a corporation. In reversing defendant Kidd's conviction, the Court stated:

> Upon consideration of all the evidence we conclude that there is a total failure of proof to show that Donald M. Kidd willfully or even knowingly violated, or authorized any one to violate the Act as charged in the information. Kidd was only a foreman for coal mining operations and was in charge of a crew of miners. There is no evidence that he ever had anything to do with policy matters or managerial functions of Consolidation.

*United States v. Consolidation Coal Company,* 504 F.2d at 1334. The Court was not requiring that Kidd be an operator as defined by § 802(d) but rather that he be in a position to control or authorize or order or carry out the operations which were allegedly in violation of the Act.

Further, the Court believes that § 819(b) should be read *in pari materia* with § 819(c) which provides in pertinent part that:

> Whenever a corporate operator violates a mandatory health or safety standard . . . any director, officer, or agent of such corporation who knowingly authorized, ordered, or carried out such violation . . . shall be subject to the same . . . fines and imprisonment

that may be imposed upon a person under subsections (a) and (b) of this section.

It would be rather anomalous to subject these types of persons to criminal sanctions if their acts could not be attributable to the corporation under § 819(b).

The motion to dismiss on this ground is denied.

IV. Counts I and II and Even-numbered Counts 16–170 are Defective Since the Validity and Accuracy of Dust Samples Can Only Be Determined by Reference to the Standards for Determining Sample Accuracy Set Forth in the Regulations at 30 C.F.R. § 70.701 *et seq.,* which Regulations Are Invalid by Reason of Improper Rule Making.

In branch four of the motion to dismiss, defendants argue that counts 1 and 2 and 16 through 171 of the indictment fail to charge offenses against the United States because they are dependent upon regulations which are invalid. According to defendants, the Secretary of the Interior and the Secretary of Health, Education and Welfare were required to follow rule-making procedures set forth in 30 U.S.C. § 811(d) when adopting the regulations in question. Since they did not, the regulations must be considered void and the counts dependent upon them must be dismissed. The government asserts on the other hand that 30 U.S.C. § 811(d) is inapplicable and that the regulations were adopted pursuant to 30 U.S.C. § 842(a) which specifically authorizes the two Secretaries to adopt the regulations.

In *United States v. Finley Coal Company,* 345 F.Supp. 62 (E.D.Ky.1972), the court was faced with a contention similar to that made herein. Defendants had been charged in 24 counts with violations of safety standards established in Subchapter III—Interim Mandatory Safety Standards for Underground Coal Mines, 30 U.S.C. §§ 861, 878. They argued that in promulgating standards the Secretary of the Interior was obliged to follow the procedures of

30 U.S.C. § 811(c)[11] and that having failed to do so, the counts involving these standards must be dismissed. The Court found that:

> The language of Section 811(c) requires consultation with specifically named classes within or materially concerned about the coal industry in "the development and revision of mandatory safety standards." The Secretary has proceeded to amend and revise the mandatory standards without such consultation.

*United States v. Finley Coal Company*, 345 F.Supp. at 66.

The Court did proceed, however, to draw a distinction between the challenged regulations based upon the particular statutory section they attempted to revise. Thus in four[12] of the nine safety standards involved in the indictment, the Secretary was given specific statutory authorization to prescribe certain regulatory standards whereas in the remaining five[13] standards no specific authorization was given. The Court concluded that:

> Where the regulations or standards promulgated by the Secretary are in response to authority granted in Sections 862 through 878, the regulations are proper and will apply in the trial of this case. But where the regulations published on November 20, 1970 by the Secretary do not reflect the exercise of authority granted in the provisions of Section 862 through 878, we hold the authority for issuing such standards lies in Section 811 and the conditions imposed by Section 811(c) are applicable.

*United States v. Finley Coal Company*, 345 F.Supp. at 67.

On appeal the judgment[14] of the lower court was affirmed, the United States

11. 30 U.S.C. § 811(c), the statutory counterpart to § 811(d), sets forth procedures to be followed when developing and revising mandatory *safety* standards while § 811(d) involves the rule-making process for developing and revising mandatory *health* standards. The similarity between the two provisions is self-evident:

30 U.S.C. § 811

(c) In the development and revision of mandatory safety standards, the Secretary [of the Interior] shall consult with the Secretary of Health, Education, and Welfare, the Secretary of Labor, and with other interested Federal agencies, appropriate representatives of State agencies, appropriate representatives of the coal mine operators and miners, other interested persons and organizations, and such advisory committees as he may appoint. Such development and revision of mandatory safety standards shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of safety protection for miners, other considerations shall be the latest available scientific data in the field, the technical feasibility of the standards, and experience gained under this and other safety statutes.

(d) The Secretary of Health, Education, and Welfare shall, in accordance with the procedures set forth in this section, develop and revise, as may be appropriate, improved mandatory health standards for the protection of life and the prevention of occupational diseases of miners. In the development and revision of mandatory health standards, the Secretary of Health, Education, and Welfare shall consult with the Secretary [of the Interior], the Secretary of Labor, and with other interested Federal agencies, appropriate representatives of State agencies, appropriate representatives of the coal mine operators and miners, other interested persons and organizations, such advisory committees as he may appoint, and, where appropriate, foreign countries. Such development and revision of mandatory standards shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health protection for the miner, other considerations shall be the latest available scientific data in the field, the technical feasibility of the standards, and experience gained under this and other health statutes. Mandatory health standards which the Secretary of Health, Education, and Welfare develops or revises shall be transmitted to the Secretary, and shall thereupon be published in the Federal Register by the Secretary as proposed mandatory health standards.

12. Those safety standards providing specific authorization are set forth at 30 U.S.C. §§ 864(b), 873(c), 877(c) and 877(n).

13. Those safety standards granting no specific authorization are found at 30 U.S.C. §§ 864(a), 864(d), 866(d), 873(a), and 873(g).

14. One count of the indictment was dismissed by the lower court on the ground that a prima facie case could not be established without the additional standards and definitions contained in the corresponding regulations.

Court of Appeals for the Sixth Circuit also finding that the Secretary had in the regulations amended and revised standards within the language of Section 811 so as to make the procedures of Section 811(c) applicable. *United States v. Finley Coal Company,* 493 F.2d 285 (6th Cir. 1974). However, I do not believe that the Court of Appeals altered the distinction, drawn by the lower court, between what could be called self-executing statutes and those dependent upon section 811. The Court was careful to note it was only considering one specific regulation before it on appeal, see n.14 *infra,* and that it was expressing no opinion as to the validity of any of the other regulations involved. *United States v. Finley Coal Company,* 493 F.2d at 291 n.6.

Defendants believe that the distinction is not proper since the regulations found to be validly promulgated by the Secretary were adopted under the specific authority of Section 861[15] which is applicable only to the safety standards of Title III and has no counterpart in the health standards of Title II which are the subject of the indictment herein.

While admittedly this is a very close question, this Court concludes that the statute involved in the challenged counts specifically authorizes the Secretaries of the Interior and of Health, Education and Welfare to prescribe the procedures by which samples are to be taken. See 30 U.S.C. § 842(a).[16] Further, 30 U.S.C. § 957 provides that the Secretaries of these departments are "authorized to issue such regulations as each deems appropriate to carry out any provision of this chapter." The specific regulations[17] in question do no

15. Section 861(d) states in pertinent part that:
In any case where the provisions of sections 862 to 878, inclusive, of this title provide that certain actions, conditions, or requirements shall be carried out as prescribed by the Secretary, or the Secretary of Health, Education, and Welfare, as appropriate, the provisions of section 553 of Title 5 shall apply unless either Secretary otherwise provides. Before granting any exception to a mandatory safety standard as authorized by this subchapter, the findings of the Secretary or his authorized representative shall be made public and shall be available to the representative of the miners at the affected coal mine.
In *Finley* the government had argued that the regulations were actions required by the Act and not revisions of mandatory safety standards, a view that was rejected by the courts.
The Court believes that defendants' contention regarding reliance upon section 861(d) is valid. See 493 F.2d at 286; 345 F.Supp. at 65.

16. 30 U.S.C. § 842(a) provides in pertinent part that:
Each operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed. Such samples shall be taken by any device approved by the Secretary and the Secretary of Health, Education, and Welfare and in accordance with such methods, at such locations, at such intervals, and in such manner as the Secretaries shall prescribe in the Federal Register within sixty days from December 30, 1969 and from time to time thereafter. Such samples shall be transmitted to the Secretary in a manner established by him, and analyzed and recorded by him in a manner that will assure application of the provisions of section 814(i) of this title when the applicable limit on the concentration of respirable dust required to be maintained under this section is exceeded.

17. The regulations specified in the challenged counts of the indictment are 30 C.F.R. § 70.220(a)(3) and 30 C.F.R. § 70.260. The former states as follows:
Upon the issuance of a notice of violation of paragraph (b) or (c) of § 70.100 of this part with respect to any working section of a coal mine, paragraph (a) of this section shall not apply in respect of that working section until the violation is abated, and the operator shall take samples with respect to that working section during each production shift as required by § 104(i) of the Act.
while § 70.260 provides that:
(a) At the conclusion of each production shift in a sampling cycle, the operator shall promptly collect and transmit all samples in a container provided by the manufacturer of the filter to:
Pittsburgh Health and Safety Technical Support Center, Mining Enforcement and Safety Administration, Department of the Interior, Pittsburgh, Pa. 15213.
(b) Each sample shall be accompanied by a completed 3 x 5 inch white data card identical to the card contained in Figure 1 of this Part 70, provided for this purpose by the cassette manufacturer. The card shall have an identification number identical to that on the cassette used to take the sample, and the name and Social Security number of the miner whose environment was being sampled. The data card shall be initialed by the miner whose environment was being sampled and

more than set forth *procedures* which prescribe the "methods, . . . locations, . . . intervals, . . . and manner" by which samples pursuant to section 842 are to be taken. The setting of such procedures is the very thing authorized by section 842.

Additionally, although the point has not been briefed, the Court has some question as to whether the regulations in question are actually amendments or revisions of statutory standards within the meaning of section 811. No sampling procedures were set forth in the Act itself since Congress designated this be done by the Secretaries of the Interior and of Health, Education and Welfare by section 842; thus in actuality there is no statutory standard which can be amended. Further, as mentioned above, the regulations do not concern substantive standards but rather procedural matters pertaining to sampling.

For these reasons the Court concludes that this branch of defendants' motion to dismiss should be denied.[18]

V. Counts 16 through 171 of the Indictment Are So Vague and Indefinite So As to Inform Defendants[19] of the Charges Against them. ·

The even-numbered counts of 16 through 171 charge that on a specified date at a specified place and time, Consol willfully failed to take and transmit an accurate sample of respirable dust following the issuance of a notice of violation. The odd-numbered counts of 16 through 171 specify certain individual defendants who are alleged to have ordered or carried out the violations. Defendants assert that these allegations are so vague that they do not inform them of the charges against them.

The essential, and perhaps the only meritorious, complaint raised by defendants is that the indictment does not specify the exact manner in which the defendants are alleged to have failed to take and transmit an accurate dust sample; that is, did they fail to take and transmit any sample at all, or did they take and transmit an inaccurate sample?

Upon consideration, the Court believes that the failure of the indictment to specify the exact manner in which the alleged offense was committed does not render it defective. While the defendants are perhaps entitled to such information, this is a matter more reasonably handled through the procedure of a bill of particulars rather than by dismissal of the indictment. The Court believes that as written, the indictment adequately charges all the essential elements of the violation charged with reference to the pertinent statutes and regulations.

Accordingly the motion to dismiss by reason of vagueness is denied.

VI. Multiplicity

Defendants next argue that the indictment is defective because of multiplicity and for this reason the majority of the 172 counts alleged should be dismissed.· Essentially defendants categorize the counts into three groups of counts—conspiracy, fraud, and willful or knowing violation of a mandatory health standard—and with respect to the latter two groups they assert that they should only be charged with one violation per group. The government contests the assertion of multiplicity, and, additionally, contends that the counts of the indictment should actually more properly be divided into four groups. Upon review of the

the representative of the company responsible for the dust sampling procedure.

**18.** The discussion regarding even-numbered counts 16–170 involving the corporate defendant is equally applicable to the odd-numbered counts involving the individual defendants.

See 30 C.F.R. § 70.220(a) and 30 C.F.R. § 70.242(a).

**19.** As to the even-numbered counts the motion is made by defendant Consol; as to the odd-numbered counts the motion is made by defendants Zitko and Marks.

pertinent statutory sections and regulations thereunder, the Court accepts the government categorization. The first group of counts consists of counts 1 and 2 which charge a conspiracy. The second group includes counts 3–13 and 172–174 charging the making of false statements and representations in a document filed with the Secretary of the Interior. The third group, counts 16–156, involves a willful or knowing failure to submit an accurate dust sample required to be submitted in order to abate a notice of violation of 30 U.S.C. § 814(i); 30 C.F.R. § 70.220(a)(3). The fourth and final group of violations consists of counts 157–171 which charge that during a sampling cycle the defendants failed either to take one high risk sample for the section being sampled for each of five consecutive production shifts each of which was worked on a separate day, 30 C.F.R. § 70.220(a)(1), or failed to submit a sample taken to satisfy this requirement.

■ In resolving the question of multiplicity it is necessary to determine "[w]hat Congress has made the allowable unit of prosecution," *United States v. Universal C.I.T. Credit Corporation,* 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952), under the Federal Coal Mine Health and Safety Act. That is, did Congress intend to punish a course of conduct or did it intend to punish separate items in such a course.

■ In *Universal* a defendant employee was charged with 32 counts of violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 215 and 216(a). The Supreme Court grouped the counts into three groups: six counts were for failure to pay minimum wages, twenty were for violations of the overtime provisions and six counts were for failure to comply with prescribed record-keeping provisions. In considering the question of whether the penalty provisions of the Fair Labor Standards Act proscribed a course of conduct as a criminal offense or whether each individual act in violation of the FLSA constituted a separate offense, the Court stated:

> Generalities about statutory construction help us little. They are not rules of law but merely axioms of experience. . . They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique. . . . For that reason we may utilize, in construing a statute not unambiguous, all the light relevantly shed upon the words and the clause and the statute that express the purpose of Congress. Very early Mr. Chief Justice Marshall told us, "Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived. . . ." Particularly is this so when we construe statutes defining conduct which entail stigma and penalties and prison. Not that penal statutes are not subject to the basic consideration that legislation like all other writings should be given, insofar as the language permits, a commonsensical meaning. But when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.

*United States v. Universal C.I.T. Credit Corporation,* 344 U.S. at 221–222, 73 S.Ct. at 229 (citations omitted). Because the statutory provisions and the legislative history of the FLSA did not demonstrate a clear intention on Congress's part to do so, the Court held that it could not be read as enabling a prosecutor to treat as a separate offense each breach of the statutory duty owed to a single employee as a separate offense. The Court believes that the instant case falls within the ambit of the *Universal* decision. Just as in *Universal,* where six counts charged minimum wage violations but only as to one employer in any one week and only as to three employees in all, so in the case at bar counts 3–8 for example charge submission of a false mine data card on one miner (Frank Balvin) for six days (April 18, 19, 22, 23, 24, 25) and counts 9–12 charge the same violation on

the same days for a different miner (John Kellaway). On one hand the Court finds the same ambiguity in the Federal Coal Mine Health and Safety Act as was found by the Supreme Court in FLSA. On the other hand this Court is also aware of that line of cases which support the government's contention that courts have adopted "a generally uniform construction of false statement statutes to penalize each individual false statement." *United States v. Simon,* 186 F.Supp. 223 (S.D.N.Y.1960); see also *United States v. Hale,* 468 F.2d 435 (6th Cir. 1972); *United States v. Private Brands,* 250 F.2d 554 (2d Cir. 1957) and cases cited therein.[20] Although, then, the Court concludes that a problem of multiplicity may perhaps exist with regard to some of the categories, it also concludes that a definite determinative at this time would be premature. As the Supreme Court observed in *United States v. Universal C.I.T. Credit Corporation,* 344 U.S. at 225, 73 S.Ct. at 231:

> Whether an aggregate of facts constitute a single offense, or more than one, may not be capable of ascertainment merely from the bare allegations of an information and may have to await the trial on the facts.

The motion to dismiss on the ground of multiplicity will be overruled at this time without prejudice to the right of defendants to raise the issue subsequently.[21] See 8 Moore, *Federal Practice* ¶ 8.07[1] and [2].

In addition to the grounds discussed above, several of the individual defendants have briefly raised various additional grounds which the Court considers to be insubstantial so as not to merit discussion. The motion to dismiss on these grounds is accordingly denied.

For the reasons discussed in the above memorandum, the motion to dismiss by defendants is denied in its entirety.

---

20. *Of course these cases would not be determinative for those counts not involving fraud.*

21. While defendants' contention regarding multiplicity might ultimately be found correct, the Court would still note it does not believe the counts in the indictment would necessarily be reduced to one for each of the latter three groups since some of the counts allege violations by different individuals.