UNITED STATES of America,
Plaintiff-Appellee,

v.

G. Cecil HARTLEY, Travis Dell and
Treasure Isle, Inc.,
Defendants-Appellants.

No. 80–5572.

United States Court of Appeals,
Eleventh Circuit.

June 17, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 8, 1982.

See also D.C., 486 F.Supp. 1348.

Justice, Fraud Section, Washington, D. C., for the U. S.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

Three defendants appeal from their convictions of conspiracy, mail fraud, violations of the National Stolen Property Act, and a violation of the Racketeer Influenced and Corrupt Organization Act [RICO]. Their appeal has launched this Court into an extensive fishing expedition undertaken by the appellants. The defendants also appeal cumulative sentences imposed by Judge George C. Carr of the Middle District of Florida. The defendants, G. Cecil Hartley, Travis Dell, and Treasure Isle, Inc., baited their appellate hooks with a large assortment of tempting issues—fourteen by their count—in an attempt to land the prize catch—a reversal.[1] We found only two deserving of a judicial nibble, but none worthy of setting the hook. Upon reeling through this opinion, the appellants will unfortunately find their catch should be mounted as "the one that got away." Affirmed.

Treasure Isle, Inc., is a Florida corporation specializing in the production of breaded seafood products. Its production of frozen breaded shrimp for consumption by the military provided the basis of the thirty-three count indictment.[2] G. Cecil Hartley serves as one of Treasure Isle's vice presidents; Travis Dell occupies the position of plant manager. Count one charged the defendants with conspiring to defraud the United States Government by supplying

Arnold D. Levine, Tampa, Fla., for G. Cecil Hartley and Travis Dell.

James M. Russ, I. Paul Mandelkern, Orlando, Fla., for Treasure Isle, Inc.

Lynn Hamilton Cole, Asst. U. S. Atty., Tampa, Fla., Breckinridge Wilcox, Dept. of

---

1. The issues raise two technical points concerning intracorporate conspiracy and application of the RICO statute to corporate defendants. The remaining issues concern various evidentiary rulings, alleged improper prosecutorial comment, insufficiency of the evidence, jury instructions, and sentencing.

2. Count one charged the defendants with conspiring to defraud the government in violation of 18 U.S.C. § 371; counts two through eighteen charged the defendants with violations of 18 U.S.C. § 1341, the mail fraud statute; counts nineteen through thirty-two charged the defendants with interstate transportation of money obtained by fraud, a violation of 18 U.S.C. § 2314; and count thirty-three contained the RICO violation, 18 U.S.C. § 1962(c).

breaded shrimp that did not conform to designated military specifications.[3] The shrimp contained too much breading, were of inadequate size, and had not been properly cleaned. Counts two through fifteen concerned mail fraud violations regarding invoices sent to the government seeking payment for the nonconforming shrimp. Counts sixteen through eighteen charged mail fraud violations for invoices directly related to sample production lots under investigation. Counts nineteen through thirty-two charged defendants with the interstate transportation of money obtained by fraud which consisted of United States Treasury checks corresponding to the invoices involved in counts two through eighteen. The RICO count charged that the activities outlined in the previous thirty-two counts established a pattern of racketeering.

After approximately ten weeks of trial, a jury convicted the three defendants of all thirty-three counts.[4] Treasure Isle was fined $167,000 for its participation in the first thirty-two counts and was sentenced to perform community service for its conviction under the RICO statute. The District Court sentenced Hartley and Dell to one year with three year's probation and a special condition of community service. Hartley additionally received a $25,000 fine.

The District Court denied the defendants' post-trial motions for an arrest of judgment, a judgment of acquittal, and a new trial.

At the center of this case are the imaginatively deceptive schemes designed to circumvent the inspection procedures implemented by the government to assure the quality of the shrimp purchased. The indictment covered a time period prior to 1970 and continuing to July, 1978. During this period three inspection procedures were employed—each inducing the defendants to charter another vessel with which to defraud the government.[5]

SCHEME I

Apparently the government had begun purchasing shrimp from Treasure Isle in the late 1960's. Pre-1974, military inspectors made individual examinations of each box of raw shrimp as well as every tank of peeled shrimp.[6] If the shrimp satisfied the inspection criteria, an "accept" card was placed on the inspected box or tank. Nonconforming shrimp received a "reject" card.

Testimony revealed that Dell directed Treasure Isle employees to remove "reject" cards from inspected tanks, replace them with "accept" cards from other inspected tanks, and destroy the "reject" cards. In this manner, tanks which had already been "accepted" would be reinspected only to again be approved by the military inspector. Rejected tanks would now bear the "accept" cards and would be placed into the subsequent production process. Treasure Isle's cooler foreman implemented the same plan on the boxes of raw shrimp at the instigation of Dell and Hartley. But, switching cards was just the beginning.

At the direction of Dell and Hartley, a Treasure Isle employee modified a weight used by the inspectors in determining the

---

3. The record discloses a finely detailed list of criteria to be used for inspection purposes. The criteria included the presence of foreign matter, dehydrated areas, the existence of black spots greater than $\frac{1}{8}$ inch, texture, color, size, weight, and percentage of breading. *See* Appellant Treasure Isle's Brief at 12–13. The results of the inspections were further analyzed by categories of defects under the military's "Acceptable Quality Level" to determine whether the defects were "major" requiring rejection or "minor" allowing acceptance of a certain amount of the production lot.

4. A fourth defendant, the personnel and assistant plant manager, was acquitted on all counts.

5. The third inspection system only becomes relevant in connection with the exclusion of test results in an alleged evidentiary ruling error, which is discussed later in the opinion.

6. Generally, the process for breaded shrimp entails cleaning, peeling, splitting and deveining the shrimp. Once this occurs, the processed shrimp are coated with meal, straightened out by hand, and coated with batter and breading. The shrimp are then quick frozen and boxed for shipping.

number of shrimp per pound. The modification was accomplished by cutting two and one-quarter ounces off of a five-pound weight. By doing so, less shrimp were required to balance out the five-pound weight, which now weighed in at four pounds, thirteen and three-quarter ounces.

Treasure Isle employees also falsified production sheets to allow for after-hour processing of shrimp, which would then be packed without having been inspected. And, employees were directed to inform the inspectors that they miscounted boxes of inspected shrimp permitting additional uninspected boxes to be added during the inspector's absence.

SCHEME II

The government changed its inspection system in October, 1974. Rather than inspecting each individual box, the inspectors began a random sampling of the "end product." Under this new system, inspectors selected thirteen boxes of breaded shrimp from each day's production. The boxes were stored overnight in a locked freezer for which only the inspectors supposedly possessed a key. Each box was marked by the inspectors prior to being placed in the locked freezer. The following day, the inspectors would retrieve the samples and conduct an analysis to determine the shrimp's conformance with the requisite specifications. If the sample shrimp conformed, the inspectors approved the entire production lot for that day.

Upon receiving notice that an entire lot had been rejected under the new system, the defendants created a new means by which to accomplish their goal. Not to be outdone by the government's selective sampling, Treasure Isle employees prepared their own sample lot. Each day a "sample run" was made in which the largest shrimp were meticulously processed. Great care was taken to peel and devein the largest shrimp; and extra caution was taken to insure no more than 40% of the shrimp's total weight was attributable to breading. The "sample run" was then set aside for special work later that evening. The production then returned to "normal". Smaller shrimp, less careful cleaning and deveining, extra breading, and sloppy freezing became the order of the day.

Reminiscent of Houdini, each night after the inspectors had departed, Treasure Isle employees would sneak into the locked freezer,[7] duplicate the inspector's markings on the "sample run" boxes, and substitute them for the sample lot selected by the inspectors earlier that day. Thus, the next day the inspectors would test only the best of Treasure Isle's production, which unsurprisingly met the military's specifications.

This was not the extent of the defendants' scheme, however. Testimony revealed that chemicals were added to large batches of shrimp which had developed a foul odor to enable the shrimp to be processed and frozen undetected. Rejected shrimp would be secretly added to other production lots. Shrimp received from abroad were also processed in the lots sold to the government. Once again, false counts were given to inspectors to enable Treasure Isle to include uninspected shrimp in government orders. And the company developed signals to alert employees of an inspector's approach.

The conspiracy reached beyond the officers and employees of the corporation, and included military inspectors assigned to the plant. Boxes of shrimp, liquor, and money were used on several occasions to bribe inspectors to falsify reports. The schemes appeared to grow and diversify until uncovered by one of the military inspectors.

DETECTION I

Years elapsed before the government learned of the shenanigans being played by Treasure Isle, its officers and employees and the military inspectors. In December, 1977, military inspector David Klopp, noticed a difference in the markings of the sample boxes stored for inspection and those inspected the following day. This prompted him to conduct an experiment by specially marking boxes in an unusual loca-

---

7. Testimony revealed that Dell and Hartley had obtained a duplicate key.

tion and checking the markings the next day. He found the boxes inspected lacked the special markings and always satisfied the military specifications. Two production lots were then designated for a more intensive investigation, the infamous lots F6968 and F7008.

Once assured that the switch had taken place, Klopp's supervisors reported to the Quality Assurance Officer at the Defense Personnel Support Center, who assigned a criminal investigator to the case. Soon thereafter the investigator interviewed a Treasure Isle employee, who revealed that the random samples selected by Klopp and bearing his special markings had been placed back into production lots F6968 and F7008. Arrangements were then made to secure these lots at their intended destinations to allow for proper testing.

Lot F6968 arrived in Watertown, Massachusetts, and was subsequently tested there by both military and civilian personnel. Sections of lot F7008 were secured and tested in Norfolk, Virginia, and Fort Worth and San Antonio, Texas. The government found the samples did not conform to the requisite specifications.

With this collection of data, the prosecutorial wheels were set in motion. On August 8, 1979, the Grand Jury returned a fourteen-page indictment. Ten weeks of trial and thirty-three convictions later, the defendants appeal to this Court for relief. Armed with enough tackle to land the big one, the appellants have cast fourteen lines into the Court's sea.[8] Two provocative issues have been raised. One, whether a corporation can conspire with its officers, agents and employees, assuming arguendo insufficient evidence to support a conspiracy with the military inspectors. And two, whether a corporation can simultaneously be the defendant and the criminal enterprise under the RICO statute. The remain-

ing issues concern various evidentiary rulings, an allegation of improper prosecutorial comment, jury instructions, and sentencing. No one will be surprised at the variety of species tangled in this net.

*The Octopus*—Intracorporate Conspiracy

■ The appellants submit that absent proof of the military inspector's knowledge of the defendants' scheme to switch the sample lots, there is insufficient evidence to connect them with the conspiracy.[9] Without outside involvement, they argue the conspiracy must necessarily be limited to a single entity—the corporation and its officers and employees. Basic to a conspiracy, however, is the requirement of an agreement between *two or more* parties. *Nelson Radio & Supply v. Motorola*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). Thus, they contend that as a matter of law there could be no conspiracy between Treasure Isle, Travis Dell, and G. Cecil Hartley, since collectively they form a single entity. We find sufficient evidence from which a jury could connect t. ) military inspector with the overall conspiracy to defraud the government and additionally find no difficulty in abandoning the single entity fiction for purposes of these convictions under the criminal conspiracy statute, 18 U.S.C. § 371 (1976).

Because the government elected not to prosecute the military inspectors in this case, we are not confronted with an evaluation of the sufficiency of the evidence with respect to convictions of the inspectors. And yet, the essence of the appellants' intracorporate conspiracy issue revolves around the lack of evidence to prove the inspectors' knowledge of the switching scheme, labeled by appellants as the "linchpin" of the conspiracy. Our duty then is limited to examining the record to determine if it reveals sufficient evidence to

---

8. Each appellant has "adopted by reference" the arguments of the two remaining appellants pursuant to Fed.R.App.P. 28(i).

9. Two military inspectors provided testimony regarding their acceptance of shrimp, liquor, and money during their term of duty at Treas-

ure Isle. Three inspectors were named in the indictment under the conspiracy count for their acceptance of these gratuities. Inspector Davis provided the most extensive testimony and is the primary source for our discussion on the existence of an independent coconspirator.

support the defendants' convictions of conspiring with the military inspectors. By viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), could "a reasonably minded jury . . . accept the relevant evidence as adequate and sufficient to support the conclusion of the appellant's guilt beyond a reasonable doubt." *United States v. Tolliver*, 665 F.2d 1005, 1007 (11th Cir. 1982).

Testimony from the military inspectors disclosed numerous instances in which Inspectors Davis and Sims received gratuities in the form of money, shrimp, and liquor in exchange for falsifying inspection reports, which would otherwise have rendered unfavorable results for Treasure Isle. A Treasure Isle employee, Butch Sheffield, corroborated the inspectors' testimony. He testified to having given shrimp to Inspector Davis at the direction of Hartley and Dell. He also recounted an episode during which Inspector Davis retrieved money from Hartley's desk and commented to him: "I want you to look here what they give me for all I let them get by with." Record, vol. XXXIII, at 3675.

"Because a conspiratorial agreement is often reached in secrecy, the existence of the agreement or common purpose may be inferred from relevant and competent circumstantial evidence. . . ." *United States v. Ballard*, 663 F.2d 534, 543 (5th Cir. 1981) (citations omitted). Involvement in a single transaction may permit an "inference of knowledge of the broader conspiracy where the single act itself shows so much familiarity with or high-level participation in the *overall* conspiracy as to be in and of itself indicative of the broader conspiracy." *United States v. Hawkins*, 661 F.2d 436, 454 (5th Cir. 1981) (quoting *United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir. 1974)

(emphasis added)). All that is necessary is that the person "be aware of the essential nature and scope of the enterprise and intend to participate." *United States v. Conroy*, 589 F.2d 1258, 1269 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *see also United States v. Martino*, 648 F.2d 367, 404 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

By their own admissions the inspectors knew of and participated in more than one transaction to falsify reports in exchange for gratuities bestowed upon them by Treasure Isle, its officers, and employees. There can be no doubt they "knew that criminal activity was afoot." *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

■ Our review of the evidence convinces us that the inspectors were well aware of the appellants' intent to defraud the government by supplying it with nonconforming shrimp. This overall scheme to defraud encompassed not only the sample switching, but the bribing of the military inspectors. The evidence clearly reveals the inspectors' participation in the latter; lack of knowledge concerning the former does not negate the inspectors' involvement in the overall conspiracy.[10]

We reemphasize that our intention is not to assume the role of a jury in evaluating the guilt of the inspectors. Rather, we have examined the record to assure the existence of sufficient evidence from which the jury could infer the existence of a conspiracy involving Treasure Isle, its officers and employees and the independent military inspectors. It is clear such exists. Even under the antitrust cases cited by appellants, an independent coconspirator provides the multiple entities so essential to

10. We find the facts of our case sufficiently different than those in *United States v. Jordan*, 627 F.2d 683 (5th Cir. 1980). In *Jordan*, the court found the act of falsifying invoices without knowledge of purpose insufficient to establish a conviction for conspiracy. In our case, the only possible reason for the inspectors' falsification of their reports was the circumven-

tion of the government's quality requirements for the shrimp purchased. The objective was crystal clear and their participation in this phase of the overall scheme to defraud provided sufficient evidence with which the jury could have determined that the defendants conspired with a noncorporate party.

the finding of a conspiracy. *See Johnston v. Baker*, 445 F.2d 424 (3d Cir. 1971); *United States v. Sherpix, Inc.*, 512 F.2d 1361 (D.C.Cir.1975); *United States v. Spiezio*, 523 F.Supp. 264 (E.D.Pa.1981). While the existence of noncorporate coconspirators alleviates the need for a discussion of the intracorporate conspiracy doctrine, the provocative nature of the issue compels us to rule on its application to the facts of this case.

The difficulty in accepting the theory of intracorporate conspiracy is conceptual. Under elementary agency principles, a corporation is personified through the acts of its agents. Thus, the acts of its agents become the acts of the corporation as a single entity. The conceptual difficulty is easily overcome, however, by acknowledging the underlying purpose for the creation of this fiction—to expand corporate responsibility.

By personifying a corporation, the entity was forced to answer for its negligent acts and to shoulder financial responsibility for them. *See Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 608 (5th Cir. 1981). The fiction was never intended to prohibit the imposition of criminal liability by allowing a corporation or its agents to hide behind the identity of the other. We decline to *expand* the fiction only to *limit* corporate responsibility in the context of the criminal conspiracy now before us.

Ours is not the first court to be unpersuaded by the attempted application of this agency principle in the conspiracy context. *See Dussouy*, noting with approval *United States v. Consolidated Coal Co.*, 424 F.Supp. 577 (S.D.Ohio 1976) and *Novotny v. Great American Savings & Loan Assn.*, 584 F.2d 1235, 1258 (3d Cir. 1978) (en banc) (dictum) (limited to conspiracy among officers), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). "In these situations, the action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, and the view of the corporation as a

single legal actor becomes a fiction without a purpose." 660 F.2d at 603.

The premier case applying general agency principles to preclude intracorporate conspiracy was *Nelson Radio & Supply v. Motorola*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). In *Nelson Radio* the Fifth Circuit examined an alleged conspiracy among a corporation, its officers and employees in the antitrust context.[11] In its opinion, the Court stated: "A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Id.* at 914. This language laid the groundwork for subsequent antitrust actions in which the Fifth Circuit and others consistently relied on *Nelson Radio* in refusing to allow similar actions. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910 (8th Cir. 1976); *Greenville Publishing Co. v. The Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir. 1974).

Dissatisfaction with the rule came as early as the *Nelson Radio* opinion itself. In his dissent, Judge Rives referred to an earlier United States Supreme Court decision in which Mr. Justice Burton had acknowledged without concern that the complaint had alleged a conspiracy between a corporation and four of its officials. Judge Rives stated: "My brothers use such strong adjectives as 'unique' and 'absurd' in referring to the contention of a conspiracy to which only the corporation and its own officers and agents are parties. That thought did not

11. Appellants rely primarily on antitrust cases for their position. *See, e.g., Hatley v. American Quarter House Assn.*, 552 F.2d 646 (5th Cir. 1977); *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389 (5th Cir. 1976).

occur to Mr. Justice Burton . . . ." 200 F.2d at 918 (Rives, J. dissenting).[12]

Antitrust litigation is a peculiar form of legal action. Indeed, the language of the Sherman Act alone gives pause for consideration of intracorporate conspiracy within its framework. Section one's reference to conspiracies "in restraint of trade" implies a requirement of multiple entities; whereas section two's prohibition of monopolies aims at a single conglomerate. If section one's conspiracy charge was satisfied by a single corporate entity, it would arguably render section two meaningless. *See Dussouy*, 660 F.2d at 603. But even in the antitrust areas courts have fashioned an exception to the general rule "when the officer has an independent personal stake in achieving the corporation's illegal objective." *Greenville Publishing Co., Inc. v. The Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.*, 497 F.Supp. 513 (M.D.Fla. 1980).[13]

Outside the antitrust sphere, the single entity concept has met sterner opposition. The issue has been encountered in § 1985 actions concerning conspiracies to discriminate. While the outcomes are far from consistent, it has been held that when more than one act of discrimination is alleged, a cause of action for conspiracy exists between corporate officers. *Novotny v. Great American Federal Savings & Loan Assn.*, 584 F.2d 1235 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (assuming but expressly withholding decision on this issue). *See also Craft v. Board of Trustees*, 516 F.Supp. 1317 (N.D.Ill.1981); *An-Ti Chai v. Michigan Technological University*, 493 F.Supp. 1137 (W.D.Mich.1980).[14]

In *United States v. Consolidated Coal Co.*, 424 F.Supp. 577 (S.D.Ohio 1976), the District Court confronted the single entity fiction in a criminal conspiracy setting. It held "that a corporation *can* be charged with conspiring with its corporate personnel." *Id.* at 581 (emphasis supplied). The court relied in part on the words of Mr. Justice Harlan in his concurring opinion in *United States v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962) (Harlan, J. concurring) (see note 12 *supra* ). "[T]he fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a shield against criminal

---

**12.** Subsequently, the United States Supreme Court held a corporate officer subject to prosecution under section one of the Sherman Act in an indictment alleging a conspiracy between the officer and his corporation. The Court did not address any perceived difficulty with the alleged members of the conspiracy. *United States v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

**13.** Sections one and two of the Sherman Antitrust Act provide respectively:

§ 1 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (1976).

§ 2 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (1976).

**14.** *Cf. Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972), *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Herrmann v. Moore*, 576 F.2d 453 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Jagielski v. Package Machine Co.*, 489 F.Supp. 232 (E.D.Pa. 1980).

prosecutions. . . ." *Id.* at 417, 82 S.Ct. at 1362. We find this language most persuasive and in line with the underlying purpose that led to the creation of the fiction of corporate personification. It originated to broaden the scope of corporate responsibility; we will not use it to shield individuals or corporations from criminal liability.

The former Fifth Circuit recognized this exception to the fiction in criminal conspiracy cases in *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1981) when it stated: "a corporation can be convicted of criminal charges of conspiracy based solely on conspiracy with its own employees." *Id.* at 603. We now adopt this exception and hold that it is possible for a corporation to conspire with its own officers, agents and employees in violation of 18 U.S.C. § 371.

Like the octopus, appellants' conspiracy issue possesses tentacles which reach out to allege the improper admission of coconspirator's statements, the trial court's refusal to instruct the jury on its *James* determination, and an improper denial of a judgment of acquittal. We find the tentacles no more persuasive than the octopus itself.

*Tentacle I*—Coconspirator's Statements

Federal Rule of Evidence 801(d)(2)(E) articulates the coconspirator exception to the hearsay rule. It provides for the admission of statements "by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). The appellants argue that absent proof that the military inspectors "were knowing participants in the schemes and conspiracy," their testimony should not have been admitted. Appellant Hartley's Brief at 14. Appellants are quick to point out statements made by the inspectors which implicate them in acceptance of gratuities and the falsification of inspection reports, but they are retiscent when it comes to any inferences to be derived from these facts. They claim the record is void of any testimony disclosing that the inspectors verbally informed the appellants of their falsification of the worksheets, that they were instructed by the appellants to do so, or that they entered into an agreement to do so.

In order to admit coconspirators statements, the trial judge is required to determine if evidence independent of the hearsay statements shows a conspiracy did exist, that the persons were members of the conspiracy, and that the statements were made during the course and in furtherance of it. *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).[15] We find the record contains ample evidence to support the trial court's decision to admit the coconspirators' statements.

"The essence of conspiracy is the agreement to engage in concerted unlawful activity." *United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). There is no requirement, however, that the agreement be express. In fact, the secret nature of a conspiracy in most instances requires the trier of fact to infer its existence from the surrounding circumstances. A witness's "own statements constitute independent evidence for the purpose of applying the *James* standards as to that particular [participant]." *United States v. Roe*, 670 F.2d 956, 963 (11th Cir. 1982). Inspector Davis's testimony revealed numerous instances where he accepted money and shrimp from Hartley and Dell. His testimony also revealed his alteration of inspection reports to reflect satisfactory conformance of shrimp which had previously been rejected under the stringent military specifications. Davis testified that he altered the reports after discussing the rejection of the shrimp with Dell. Appellants rebutted by contending that the inspectors stole the shrimp without the knowledge of Hartley and Dell and that the falsification of records was a unilateral action undertaken by Davis. But credibility is for the fact finders.

---

**15.** Appellants do not take issue with the court's procedure in determining admissibility under *James*, only that his conclusion was in error.

Considering the inspector's awareness of his own job and the consequences of his verification of the shrimp's quality, there can be no doubt he had knowledge of the deception taking place. His acceptance of gratuities during the same time period clearly gives rise to the inference of a conspiracy. *See United States v. Willis*, 639 F.2d 1335, 1339 (5th Cir. 1981). This logical inference provides the essential nexus that appellants' argue is lacking.

We have no difficulty in finding the trial court correctly determined the existence of credible evidence independent of hearsay statements showing the existence of a conspiracy. Likewise, we also find the court correctly concluded that the hearsay statements were made during the course of and in furtherance of the conspiracy. Thus, the District Court properly admitted Davis's testimony.[16]

Appellants contend *United States v. Jordan*, 627 F.2d 683 (5th Cir. 1980) compels a contrary ruling on this issue. *Jordan* involved a conspiracy to defraud the government through the falsification of invoices for milk and orangeade sold to a school participating in a federally funded lunch program. The court reversed the conviction of a clerical employee of the dairy, Jordan, who under instructions from his employer, falsified the invoices. The record had disclosed no evidence to show Jordan's knowledge of the purpose for altering the invoices, which the court found essential to support his conviction of participation in the conspiracy. Such facts are inapposite to those presented here.[17]

*Tentacle II—Jury Instructions*

During the charge conference, the appellants requested the District Court to in-struct the jury that in determining a defendant's participation in the conspiracy it should consider "only that evidence, if any, pertaining to his own acts and statements." The court refused their request. Citing the Fifth Circuit's holding in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the appellants now argue that this refusal in combination with the court's refusal to advise the jury of its *James* determination impermissibly allowed the jury to consider hearsay evidence and acts other than those of each individual defendant in determining the appellants' participation in the conspiracy. The appellants would have the jury's consideration limited solely to each appellant's own acts and statements excluding all hearsay.

■ It is not surprising the appellants want to limit the evidence available for the jury's consideration of their guilt. But, *James* did not articulate such a restriction. It merely delegated the question of admissibility to the "trained legal mind of the trial judge." *Id.* at 579. Once this determination has been made, the jury is free to consider the hearsay and the acts of other coconspirators in arriving at its verdict, just as it is permissible for the court to consider the hearsay in determining the sufficiency of the evidence. *United States v. Mesa*, 660 F.2d 1070 (5th Cir. 1981).

It appears the appellants misconceive the ramifications of *James*. Prior to *James*, trial courts subscribed to a system where the judge gave cautionary instructions to the jury concerning "the role of hearsay evidence in conspiracy cases...." *United States v. Apollo*, 476 F.2d 156, 163 (5th Cir.

---

**16.** The appellants specifically attack Inspector Davis's testimony as the only noncorporate link with which to establish a conspiracy. Their argument presupposes we would require his participation in order to support the existence of conspiracy under their theory. According to their analysis, if Davis is not a coconspirator, no conspiracy could exist, (*see* previous discussion on intracorporate conspiracy) therefore, none of the Treasure Isle employees could testify on statements made by Hartley and Dell regarding other events contributing to the over-all conspiracy to defraud. Unfortunately for the appellants, our ruling on the intracorporate conspiracy has destroyed their underlying premise.

**17.** Appellants additionally argue that the improper admission of Davis's testimony tainted the remaining counts by confusing and misleading the jury. Since we find no error in the District Court's admission of the testimony for the conspiracy count, there can be no prejudice requiring reversal on the remaining counts.

1973). Under this system, the judge instructed the jury at the time the hearsay was introduced and again during the final charge. These instructions were necessary to inform the jury of its preliminary duty to establish the existence of the conspiracy and each defendant's participation in it, based solely on independent, nonhearsay evidence, prior to considering the hearsay in combination with other evidence in arriving at its verdict. Because the difficult task of determining admissibility and the use of the hearsay rested with the jury, it was crucial that it be alerted to the basic concept that an individual's participation in a conspiracy be determined through independent evidence of his own acts and statements.

The instruction to the jury on the restricted use of coconspirators' statements became known as the *Apollo* instruction. The jurors were instructed to consider only the acts and statements of the individual conspirator when deciding his participation in the conspiracy. Of course, as was later recognized, if the independent evidence satisfied the jury of the existence of the conspiracy and of the membership of the defendant(s) being considered, the coconspirator's hearsay was surplusage and unnecessary.

*James* eliminated the need for a jury instruction on the preliminary finding of the existence of a conspiracy and the defendant's participation in it. That task now rests with the trial judge. Unlike the jury, the trial judge is well acquainted with the limitation of considering *only* independent evidence of each individual's own acts in determining participation in the conspiracy. Implicit within the judge's admissibility determination then is a finding that the particular defendant's own acts and statements, independent of the hearsay, established his membership in the conspiracy. Once this determination has been made, the

hearsay testimony achieves the same status as all the other direct and circumstantial evidence.

The jury's role is determining the defendant's guilt beyond a reasonable doubt. In order to properly make this determination, the judge instructs the jury on the applicable law. In this instance, the trial court correctly instructed the jury on the three requisite elements for a conspiracy conviction.

What the evidence in the case must show beyond a reasonable doubt is one, that two or more persons in some way or manner positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment.

Second, that the defendant willfully became a member of such conspiracy.

Third, that one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the means or methods or overt acts described in the indictment; and four, that such overt act was knowingly committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy.

Record, vol. LXXVI, at 7872–73.

The third element obviously allows the jury to consider the acts of other coconspirators. Any overt act in furtherance of the conspiracy would satisfy it. Thus, an instruction limiting the jury's consideration to a defendant's *own* acts is not only unnecessary, but might tend to confuse the jury's consideration of the third element of a conspiracy.[18] In fact, the Fifth Circuit was recently confronted with precisely the opposite situation. *United States v. Whitley*, 670 F.2d 617 (5th Cir. 1982). In *Whitley*, the District Court gave the following instruction:

---

**18.** The District Court defined the terms knowingly and willfully as used within the elements of conspiracy. In addition, he articulated the following:

[B]efore any defendant may be held criminally responsible for the acts of others, it is necessary that the accused willfully associate

himself in some way with the criminal venture and willfully participate in it as he would in something he wishes to bring about, that is to say that he willfully seek by some act or omission of his to make the criminal venture succeed.

Record, Vol. LXXVI, at 7884–85.

In your consideration of the conspiracy offense as alleged in the indictment, you should first determine from all of the testimony and evidence in the case whether or not the conspiracy existed as charged.

If you conclude that a conspiracy did exist as alleged, you should next determine whether or not the defendant under consideration willfully became a member of such conspiracy.

*In determining whether a defendant was a member of an alleged conspiracy, however, the jury should consider only that evidence, if any, pertaining to his own acts and statements.* He is not responsible for the other acts or declarations of other alleged participants 'til it is established beyond a reasonable doubt, first, that a conspiracy existed, and, second, from the evidence of his own acts and statements, that the defendant was one of its members.

On the other hand, if and when it does appear beyond a reasonable doubt from the evidence in the case that a conspiracy did exist as charged and that the defendant under consideration was one of its members, then the statements and acts knowingly made and done during such conspiracy and in furtherance of its objects, by any other proven member of the conspiracy, may be considered by the jury as evidence against the defendant under consideration, even though he was not present to hear the statements made or see the act done. This is true because, as stated earlier, a conspiracy is a kind of partnership, so that, under the law, each member is an agent or partner of every other member, and each member is bound by or responsible for the acts and statements of every other member made in pursuance of their unlawful scheme.

*Id.* at 620 (emphasis supplied). The defendant argued this instruction improperly deferred the admissibility question to the jury. The Fifth Circuit disagreed. "The instruction is a variation of the standard jury instruction on proof of membership in a conspiracy." *Id.* at 621. "Once admitted, the jury assesses the weight and credibility of such statements, just as it evaluates all evidence." *Id.*

■ There is an unclear suggestion that the trial court should have instructed the jury on its *James* determination. It would have been improper for the judge to have done so. "Such an instruction can serve only to alert the jury that the judge has determined that a conspiracy involving the defendant has been proven by a preponderance of the evidence." *United States v. Vinson,* 606 F.2d 149, 153 (6th Cir. 1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). *See also United States v. Nickerson,* 606 F.2d 156 (6th Cir.), cert. denied, 444 U.S. 994, 100 S.Ct. 528, 62 L.Ed.2d 424 (1979). The instruction could affect not only the jury's determination of witnesses' credibility, but ultimately the defendants' guilt.

■ We have reviewed the District Court's instructions on the conspiracy issue. We find that the charges as a whole completely and fairly educated the jury on the legal principles and the weighing of the evidence in arriving at its verdict. *United States v. Hirst,* 668 F.2d 1180 (11th Cir. 1982); *United States v. DeLeon,* 641 F.2d 330 (5th Cir. 1981); *United States v. Diecidue,* 603 F.2d 535 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

*Tentacle III —Judgment of Acquittal*

The District Court's denial of the defendants' motions for judgment of acquittal is the appellants' fourth attempt to convince us of the absence of sufficient evidence to support the conspiracy convictions. Like the attempts which have come before, this one will not save the sinking ship. In reviewing a trial court's denial of a judgment of acquittal, we are restricted to viewing the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Viewed in this light, we must determine whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United*

*States v. Bell,* 678 F.2d 547 at 549 (5th Cir. 1982) (en banc). We previously commented at length on the existence of sufficient evidence from which a reasonable jury could have and in fact did render guilty verdicts. We see little point in reiterating the evidence here. We simply wish to address the one case primarily relied on by the appellants in this issue and their brief suggestion that the trial court should have instructed the jury on multiple conspiracies.

The appellants have cited this Court to the case of *United States v. Rosenblatt,* 554 F.2d 36 (2d Cir. 1977) and have urged us that the similarity in facts requires us to arrive at the same conclusion. In *Rosenblatt,* the Second Circuit reversed the conviction of a defendant when it found the government had failed to plead or prove "an agreement on the essential nature of the fraud." *Id.* at 42. The stipulated facts showed that one party had made false entries in postal records in order to secure government checks payable to nonexistent accounts payables. The government stipulated that Rosenblatt had no knowledge of the falsification of the records nor of the fraudulent receipt of government monies. Rosenblatt had merely agreed to "launder" the checks on the assumption that the payees of the checks could avoid certain tax consequences. Since each member of the conspiracy operated under different conceptions of the ultimate objective, the court found no agreement as to "the essential nature" of the conspiracy.

■ The essential nature of the conspiracy before us was to defraud the government by supplying shrimp that did not conform to designated military specifications. All coconspirators worked toward that single objective, even though the schemes employed to accomplish it varied, as did the participants. "A single plan does not become many plans simply because some members [are] cast in roles more vital than

others, or because certain members performed only a single function." *United States v. Bates,* 600 F.2d 505, 509 (5th Cir. 1979), *quoted in United States v. DeLeon,* 641 F.2d 330, 334 (5th Cir. 1981). Unlike the facts in *Rosenblatt,* our facts reveal the government pled and proved one single conspiracy comprised of multifareous schemes to supply the government with nonconforming shrimp. We are unpersuaded.[19]

*The Grunt*—Rule 16

Rule 16(a)(1)(c) provides for the government's production, upon request, of documents in its possession or control "which are material to the preparation of [a] defense or are intended for use by the government as evidence in chief at the trial...." Fed.R.Crim.P. 16(a)(1)(C). When a party fails to comply with this rule, the District Court may impose sanctions which include prohibiting "the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." *Id.* (d)(2).

■ During the course of trial, specifically during Inspector Davis's direct testimony, the government sought to introduce records which Davis claimed showed alterations he had made in falsifying the inspection results. According to the government, these documents had been obtained from Davis only a few days prior to trial and the government had decided to use them the day before. Appellants entered an immediate objection to the introduction of these reports. The District Court ruled the government's failure to disclose the reports violated Rule 16 and did not permit their introduction. The court did, however, permit the government to elicit testimony from Davis and other inspectors concerning their falsification of the reports. In addition, the court prohibited either party from arguing to the jury that the altered documents were missing. The court directed the government to give the reports to defense counsel,

**19.** Our conclusion simultaneously disposes of appellants' suggestion that the District Court should have instructed the jury on multiple conspiracies. In addition, as the government points out, the appellants failed to object to the court's charge on this ground. Government's Brief at 68 n.26.

and extended permission for the defense to later recall Davis for further cross examination. The appellants contend the court's sanctions should have *included* a preclusion of Davis's testimony regarding the falsification of the reports and *excluded* the limitation on closing argument. We disagree.

■ The trial court is granted broad discretion in imposing sanctions for discovery violations. *United States v. Watson*, 669 F.2d 1374 (11th Cir. 1982). "Implicit in the discretion granted the district court under rule 16(d)(2) is that the district court, in deciding what sanction to impose, consider several factors: 'the reason why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances.' " *United States v. Sarcinelli*, 667 F.2d 5, 6–7 (5th Cir. 1982) (quoting 8 Moore's Fed. Practice ¶ 16.04(3) (2d Ed. 1981)).

First, the government explained its last minute decision to offer the documents into evidence and that it had only obtained possession of them days before. Nevertheless, the court disallowed the introduction of them; a sanction which punished the government for violation of Rule 16 and protected the interests of the defendants.

Second, the appellants cite this Court to the record to substantiate the existence of prejudice. The record demonstrates that Inspector Davis had previously denied any wrongdoing in reporting his inspections of the shrimp. The defendants argue that they believed that the receipt of gratuities constituted the extent of the inspector's involvement. The prosecution's proffer alerted the defendants to the inspector's

involvement in the falsification of records. The court's willingness to allow for future cross examination of Davis remedied any possible prejudice that might have occurred. Thus, we find the record has failed to establish any outstanding prejudice to the substantial rights of appellants. *United States v. Arguelles*, 594 F.2d 109 (5th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Valdes*, 545 F.2d 957 (5th Cir. 1977); *United States v. Arcentales*, 532 F.2d 1046 (5th Cir. 1976).

Third, there is no indication that a continuance was requested or would have been justified.

Finally, the overwhelming evidence, the government's ability to have elicited the testimony without the reports, and the appropriate sanctions imposed lead us to conclude the District Court acted well within the bounds of discretion afforded him.

*The Red Herrings*—Fourth Amendment and Posse Comitatus Claims

Before trial, Treasure Isle moved to suppress any evidence connected to Inspector Klopp's plan to specially mark the sample boxes and the subsequent testing of lots F6968 and F7008, alleging a fourth amendment violation. Hartley and Treasure Isle subsequently filed suppression motions based on the use of military personnel in the investigation of this case alleging a violation of the Posse Comitatus Act.[20] The District Court denied these motions.[21]

■ The essence of the appellants' fourth amendment claim is that by specially marking the sample boxes, Inspector Klopp executed a warrantless search. They contend that the inspector's *permissible* presence on the plant was limited by contract to

**20.** The Posse Comitatus Act provides:
Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act or Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years or both. 18 U.S.C. § 1385 (1976). Posse comitatus has been defined as: "The power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to

aid him in keeping the peace, in pursuing and arresting felons, etc." Black's Law Dictionary 1046 (5th ed. 1979), *quoted in United States v. Hartley*, 486 F.Supp. 1348, 1356 n.10 (M.D.Fla. 1980).

**21.** All of the defendants adopted these motions as well as motions to dismiss and a motion in limine. The District Court denied these motions as well. *The court set forth its reasoning in great detail in United States v. Hartley*, 486 F.Supp. 1348 (M.D.Fla.1980).

the inspection of the sample shrimp and *did not* extend to his investigation of suspected fraud. The District Court held that Hartley and Dell lacked the requisite "expectation of privacy" necessary to sustain a fourth amendment claim.[22] In evaluating the corporation's claim, the District Court reviewed the case law concerning the privacy rights of corporations and the past history of the relationship between the government inspectors and Treasure Isle. It found that under the circumstances, the corporation could not justify its asserted expectation of privacy. We agree.

The government had been permitted access to areas in the Treasure Isle plant ordinarily closed to the general public. The corporation and its officers and employees were fully aware of the government's presence and its purpose for being there. "Anyone tampering with the sample boxes under such conditions could not justifiably believe that their activities would escape the scrutiny of those charged with insuring that such activities did not occur." *United States v. Hartley*, 486 F.Supp. 1348, 1355 (M.D.Fla.1980).

The Posse Comitatus Act claims cause us even less concern. In ruling on the defendants' motion, the District Court held that no violation of the Act had occurred since the military inspectors had merely exercised their responsibilities pursuant to the contract between the government and Treasure Isle in order to assure the quality of the shrimp purchased.[23] The military aided the civilian employee in charge of the

investigation only to the extent of activities normally performed in the ordinary course of their duties. The fact that that performance evolved into an investigation of an elaborate scheme devised by the defendants to circumvent the effectiveness of the government's inspection system does not transform their activities into "military permeation of civilian law enforcement." *Id.* at 1357.[24] We agree with the District Court's rulings on these issues.

### *The Blowfish* —The Crustacean Confrontation Problem

Appellants raise a due process issue based on their alleged inability to test all the shrimp subject to the charge of nonconformity covered in the indictment. They assert a denial of fundamental fairness due to (1) the government's consumption of breaded shrimp subsequent to suspicion of its nonconformity; (2) the government's improper handling of the production lots F6968 and F7008 precluding the defendants from independently testing it; (3) the government's introduction of photographs of nonconforming samples; and, (4) the government's credibility attack on government employees who found the shrimp to conform to the military specifications. These points were raised in the appellants' motions to dismiss, to suppress and in limine. The District Court held an evidentiary hearing, reviewed supporting memoranda, and considered the relevant legal standards. The court concluded that the defendants had failed to establish an improper governmental motive for the intentional

---

**22.** *See United States v. Meyer*, 656 F.2d 979, 980 (5th Cir. 1981). The court did impliedly find that the markings constituted a search reasoning that the markings were made for the purpose of gathering evidence, but found the individual defendants lacked the requisite property interest in the items and location searched.

**23.** Additionally, the court ruled that the exclusionary rule was not an appropriate remedy assuming a violation of the Act could be proven. *See United States v. Wolffs*, 594 F.2d 77 (5th Cir. 1979), *cited* in *United States v. Garcia*, 672 F.2d 1349, 1368 n.33 (11th Cir. 1982).

**24.** The District Court reiterated a three-prong test for violations of the Act originally proposed in *United States v. McArthur*, 419

F.Supp. 186 (D.N.D.), *aff'd sub nom., United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). The test questioned: (1) whether civilian law enforcement officials had made a "direct active use" of the military inspectors to "execute the laws;" (2) whether the use of the military "pervaded the activities" of the civilian officials; or (3) whether the military was used so as to subject "citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *Id.* at 194. The court found none of the tests satisfied by the facts of the case.

consumption of the shrimp and that they had failed to establish even negligent conduct on the part of the government in its preservation of shrimp for testing purposes. Record, vol. CIII, at 1869. We agree.

The indictment covered shrimp sales for an extended period of time. In 1976, the Defense Investigative Service initiated the first investigation centered on alleged improprieties occurring within the inspection processes. The government terminated this investigation in December, 1976. A new investigation arose in the Spring of 1977, this time it focused on the alleged bribery of military inspectors. It was not until Inspector Klopp became suspicious in December, 1977, that a full-fledged investigation of the inspection system was undertaken. It was at this time two production lots (F6968 and F7008) became the central target for determining whether deception was being employed to supply the government with nonconforming shrimp.

The two production lots were traced to their intended destinations and held for subsequent testing. In the meantime, other shipments of shrimp continued to satisfy the appetites of military personnel. The two production lots retained, including boxes possessing the special markings made by Inspector Klopp, were tested on three separate occasions by military inspectors. These inspectors provided critical prosecution testimony revealing the nonconformity of shrimp in the two production lots.

Treasure Isle learned of the ongoing criminal investigation in May, 1979. At this time, the defendants contacted the government to obtain information on "the nature and extent" of the investigation. The government declined to divulge any information beyond the fact that the investigation was criminal in nature. Defendant Hartley subsequently requested the govern-

ment to secure and preserve recently produced shrimp. The government advised him that most of the shrimp had been consumed in the ordinary course of use, but extended the opportunity to inspect the two production lots central to its investigation prior to the return of the indictment. Hartley travelled to Norfolk, Va., where he inspected and tested the shrimp. Dissatisfied with the testing procedures mandated by the government prosecutor, he did not take advantage of the additional opportunity to test shrimp from the samples retained in San Antonio.[25] Upon the indictment's issuance, the government transported the remaining samples from lots F6968 and F7008 to Tampa where the appellants were given an additional opportunity to test them. They declined to do so.[26]

Appellants contend that the government's consumption of the shrimp and its careless handling of the remaining samples, while exhibiting pictures of samples they found nonconforming, placed them on the "horns of a dilemma," without the ability to properly defend against the allegations presented. In addition, they argue the government further prohibited them from defending their position by attacking the credibility of government employees called as defense witnesses, who had allegedly tested the sample shrimp and obtained favorable results.

In *United States v. Herndon*, 536 F.2d 1027 (5th Cir. 1976), the Fifth Circuit discussed due process as it relates to evidence which the government has lost or destroyed preventing the defendant from independently examining it. The court found that fundamental fairness entitles a defendant "to access to relevant and material evidence which is necessary for him to prepare his defense." *Id.* at 1029. "Whether a defendant has been deprived of this right of due

---

**25.** Production lots F6968 and F7008 were used to fill three separate military contracts, which were shipped to Norfolk, Va., Watertown, Mass., Fort Worth and San Antonio, Tex.

**26.** Throughout the trial the issue of whether the remaining samples were "testable" was hotly contested. The appellants' expert witness testified that the product had been al-

lowed to thaw and refreeze precluding an accurate examination of its weight and breading percentage. The government produced evidence that the product had not significantly thawed and was capable of testing for other defects (veins, black spots, shells) outlined in the military specifications.

process will depend upon the materiality of the evidence, the likelihood of mistaken interpretation of it by government witnesses or the jury, and the reasons for its nonavailability to the defense." *Id.*

In applying these factors, the Fifth Circuit has developed a "bad faith" test.[27] Absent an indication of "improper governmental motive," the court has consistently refused to find a due process violation sufficient to warrant reversal. *United States v. Gordon*, 580 F.2d 827 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Armstrong v. Collier*, 536 F.2d 72 (5th Cir. 1976).

 In applying this standard to the consumption claim, the District Court found that "[w]hile the consumption of the shrimp was 'intentional', [sic] there is no evidence that there was an improper governmental motive in this case .... [O]nce that shrimp was purchased it was not unreasonable for it to be consumed." Record, vol. CIII, at 1869. We agree. Assuming arguendo the untestable condition of the shrimp, we also agree with the District Court that appellants "have failed to sufficiently establish that there was intentional or even negligent conduct on the part of the Government agents which has caused the shrimp to be untestable for pertinent characteristics."[28] *Id.*

 The admission of photographs of the nonconforming shrimp is also controlled by a demonstration of bad faith on the part of the government accompanied by resulting prejudice. *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980). As we have already noted, we find no evidence of bad faith. Further, the overwhelming volume of testimony concerning the nonconformity of the shrimp renders the supplement of photographs insufficient to establish any true prejudice to the defendants.

 We perceive no error in the cross examination of government employees who found the shrimp to conform to the military specifications. The very purpose of cross examination is to allow opposing counsel to confront adverse testimony from witnesses. Nor do we find the prosecutor's comments regarding their qualifications as inspectors beyond the scope of permissible comment.

Once again the appellants have failed to convince us of an impropriety establishing cause for reversal.

*The Swordfish* —Exclusion of Test Results

 One of the evidentiary issues raised by the appellants concerns the District Court's decision to exclude test results favorable to the appellants. What at first glance appears to be a harsh ruling approaching the level of error, upon further examination is exposed as an attempt by the defendants to wield two swords. This we cannot allow. We find the trial court's ruling proper and well within the discretion afforded it in such circumstances.

In February, 1978, the government changed its inspection procedures. The military inspectors were replaced with civilian employees working for the United States Department of Commerce. Along with the change in personnel, came a change in the inspection procedures and the specifications. The new inspectors evaluated the shrimp under similar criteria for many of the same defects outlined in the military specifications; such as, veins, black spots, shells, and breading percentages. However, the standards and the means for determining conformance varied from those previously employed.[29]

---

**27.** We note the plethora of case law from the various circuits set forth in appellant Dell's brief. We appreciate the presentation of opposing views, but are bound by the standards followed by the Fifth Circuit prior to Oct. 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

**28.** Apparently, testimony revealed the shrimp's condition could be attributed to natural deterioration over an extended period causing unreliability in any subsequent test results.

**29.** Under the new system, Treasure Isle employees selected the samples for inspection.

During the presentation of the government's case, the prosecutor proffered testimony of actions taken by the defendants after implementation of the new system in order to prove that they continued to provide fraudulent samples even after the change in inspection procedures. The appellants vehemently objected. They argued the proffered testimony dealt with inspection procedures outside the scope of the indictment and that the evidence would be confusing and misleading to the jury.[30] The trial court sustained the objection under Fed.R.Evid. 403.[31] When the defendants presented their case, they introduced seven quality audit reports prepared between June, 1976, and February, 1977, showing results favorable to Treasure Isle. They next proffered four quality audit reports of shrimp produced between May and December, 1978, as well as inspection results of shrimp produced in January, 1979. These reports, however, were based on the Commerce Department standards implemented in February, 1978; the very standards which had served as the basis for the defendants' objections to the prosecutor's earlier proffer. In line with its prior ruling that evidence concerning the new inspection system was beyond the charges in the indictment and would confuse the jury, the District Court refused to admit these reports.

The appellants argue that in case of fraud the court should be lenient in admitting evidence of collateral transactions which tend to negate the deceptive schemes with which they are charged. While this may be true, the appellants' argument suffers from a fatal flaw—they entered an objection which was never withdrawn. They cannot use one sword to slice into the prosecutor's proffer by convincing the trial court of the confusing nature of the evidence and subsequently switch blades to proffer evidence afflicted with the same defect. This fish has but one sword and its blade was dulled by defense counsel's prior objection.

"The trial court is afforded broad discretion in passing on the admissibility of evidence, and its determination will not be disturbed absent a clear showing of abuse." *United States v. Dothard*, 666 F.2d 498, 501 (11th Cir. 1982). The court ruled in defendant's favor and excluded proffered evidence supporting the government's case. Its subsequent decision to rule consistently upon encountering an identical objection by the government is not an abuse of that discretion.

*The Snook*—Cross Examination

Inspector Davis provided extensive testimony during the government's case and has been at the forefront of many of the issues raised by the appellants. This time the appellants attack the District Court's decision to sustain Davis's assertion of his fifth amendment privilege during cross examination. The appellants contend his refusal to

---

The inspectors deducted "defect points" from a possible 100 points, and then classified the shrimp according to the final score.

**30.** The following passages illustrate the defendants' objection during the government's case:
> Mr. Levine: "[W]e have a whole distinct and separate transaction that happens once U.S.D.C. [United States Department of Commerce] comes onto the scene...." Record, vol. L, at 5341.
> ....
> Mr. Russ: "Now we're shifting into going from military inspectors to U.S.D.C. inspectors while the technique is generally the same, there are significant differences that lend confusion." Record, vol. L, at 5346.

**31.** Fed.R.Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

> The District Court stated:
> I think it is probative, I think it's relevant and I think although the indictment itself could be a little more clear and be a little more, give a little better notice to the defendants, I think the Court could receive it. But I'm inclined to think balancing all of the factors that rule 403 let's [sic] the court use, that this could confuse the issue, the primary and main issue which the indictment has it's [sic] thrust, and I'm going to exclude it.

Record, vol. L, 5356.

answer certain questions concerning his income tax returns deprived them of their sixth amendment right of confrontation. This presents for our review a conflict between Davis's constitutional right to remain silent and the appellants' constitutional right to confront witnesses.

"It is an inveterate principle that a defendant who takes the stand waives his fifth amendment privilege against self-incrimination at least to the extent of cross examination relevant to issues raised by his testimony." *United States v. Beechum*, 582 F.2d 898, 907 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (citing *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958)). However, the fifth amendment's protection is not entirely lost when the testimony sought to be elicited would simultaneously incriminate the witness. Such is the case before us.

Prior to cross examination of Davis, defense counsel requested receipt of the tax forms and worksheets which Davis had brought pursuant to a subpoena duces tecum. A bench conference was held to discuss the admissibility of the documents and to determine whether the prosecution expected Davis to invoke his fifth amendment privilege. The prosecutor told the court that he did not anticipate an assertion of the privilege because, to his knowledge, Davis intended to testify that he considered the receipt of money and shrimp from the defendants to be gifts which did not require his reporting them as income on his tax returns. Defense counsel intended to dispute the existence of these gratuities by showing that Davis had failed to report them as income.

The District Court ordered Davis to give his tax returns to defense counsel for purposes of cross examination, but denied them access to Davis's worksheets. The court further ruled that Davis could invoke his fifth amendment privilege concerning whether he had included the alleged gratuities on his tax returns. Davis testified at great length about his receipt of shrimp and money from the appellants during his term of duty at Treasure Isle. During cross examination he admitted filing tax returns for 1974, 1975, and 1976, but invoked his fifth amendment privilege when asked:

"Q: Did the income tax returns that you filed for those years truly, accurately and completely reflect the income that you made during the year 1974?" [32]

Defense counsel asked the same question with respect to the years 1975 and 1976. Each time the defendant asserted his fifth amendment privilege; each time defense counsel asked the court to compel a response; and each time the court sustained Davis's right against self-incrimination.[33] The court subsequently instructed the jury that Davis's assertion could be considered in determining his credibility.

"The ultimate inquiry is whether the defendant has been deprived of his right to test the truth of the direct testimony." *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). Appellants argue that their inability to elicit these answers deprived them of the opportunity to rebut Davis's direct testimony concerning his receipt of gratuities. In view of the admission of the tax returns themselves and defense counsel's closing argument,[34] we do not find that the defend-

---

32. Record, vol. XXXI, at 3389.

33. Prior to asserting his fifth amendment privilege, Davis was permitted to consult with counsel as to whether he should respond to the questions concerning his income tax returns.

34. During his closing, defense counsel stated: Yeah, I filed tax returns. Did you report all of your income, all the money that you made, the money you say Mr. Hartley gave you, the money that you made, it's $2,500 or

$7,000 or $8,000, did you report that on your income tax returns? As an American, I take the Fifth amendment. I refuse to answer and the Judge properly sustained that. I mean he is, he is an American, he is a citizen. He has the Fifth amendment privilege. But we got his tax returns, took a little bit of time, effort, had to get it from the Government. Tax returns always show his earnings from the

ants were deprived of testing the truth. *See United States v. Tolliver*, 665 F.2d 1005 (11th Cir. 1982).[35]

*The Snapper*—Prosecutorial Comment

The fifth amendment extends to a defendant the right to remain silent. "Concomitant with that right is the prohibition of prosecutorial comment on its exercise." *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir. 1982) (citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). The appellants claim the prosecutor impermissibly commented on Dell's silence by making the following statement during closing argument:

> I do recall that in Mr. Byrd's opening statement he said something about that. He said something to the effect that they would show that much of the unrest had been brought about because the military inspectors would attempt to have affairs with a particular lady and she would turn them down and by reason of that, he would do something to get her in trouble. I don't recall any testimony about that. And I submit that in fact there was no pressure on those breading line supervisors by the Air Force. Certainly none of them testified about that. And I don't recall any of the military inspectors who have testified both for the Government

> service, from the military. Now, what does it mean? The tax returns are signed under the penalties of perjury. Well, if the tax return is true, then he didn't get any money from Mr. Hartley, then he didn't sell any product to Butch Sheffield. If the tax returns are false, then you may consider him as a perjurer and disregard his testimony because he has a lack of credibility. It doesn't make any difference which way you go. He is a liar, an admitted liar. He says he's a liar.
> Record, vol. LXXIII, at 7628–29.

**35.** We also note the broad reach of defense counsel's question. He did not ask if Davis had reported the gratuities on his tax return, but rather whether he had accurately stated his income. If required to answer, Davis would have been forced "to specify, identify, or call attention to other crimes for which he might be charged." *United States v. Wilcox*, 450 F.2d 1131, 1138 (5th Cir. 1971). This is precisely what the fifth amendment is designed to pro-

and for the defense mentioning that either.
Record, vol. LXXI, at 7380.

 The test for determining if a prosecutor has impermissibly commented on a defendant's silence is whether the prosecutor manifestly intended to comment upon the defendant's failure to testify or if the comment was "of such a character that the jury would naturally and necessarily take it to be a comment" on the defendant's failure to testify. *Samuels v. United States*, 398 F.2d 964, 968 (5th Cir. 1968), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969), *quoted in United States v. Harbin*, 601 F.2d 773, 777 (5th Cir.), *cert. denied*, 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979). *See also United States v. DeSimone*, 660 F.2d 532 (5th Cir. 1981); and *Williams v. Wainwright*, 673 F.2d 1182 (11th Cir. 1982).

 The comment by the prosecutor in this case manifests no intention to comment on Dell's silence nor is it of such a character that the jury would take it as a comment on Dell's exercise of his fifth amendment right. The snapper has broken appellants' line of reasoning on this issue.

*The Frivolous Flounder*—Insufficient Evidence (Counts 2–32)

The indictment charged the appellants with violations of the mail fraud statute [36]

tect against. *See United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

**36.** The Mail Fraud Statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing,

and the stolen property act.[37] Counts two through fifteen charged the defendants with mailing fourteen separate invoices to the government in implementation of the scheme to defraud. None of these invoices dealt with shrimp from lots F6968 or F7008, but covered invoices dating from February 27, 1976, to January 25, 1978. Counts sixteen through eighteen charged mail fraud and concerned the three invoices directly related to the shipment of lots F6968 and F7008. Counts nineteen through thirty-two charged violation of the stolen property act, with counts nineteen through twenty-one relating to checks sent in payment of the invoices contained in counts sixteen through eighteen.

Appellants have proposed two theories upon which we are requested to find the evidence insufficient to support their convictions on these counts. Segregating counts nineteen through twenty-one (checks related to lots F6968 and F7008) from the others, the appellants argue that because the government had an awareness of possible fraudulent activity at the time these three checks were written, it could not have been defrauded. Appellants suggest that it is essential for a conviction under 18 U.S.C. § 2314 (1976) that the government prove it was deprived of the checks by fraud, that suspicion of fraudulent activity equates to knowledge, which in turn negates the existence of fraud. "Indeed, proof that the intended victim was actually defrauded is not required to sustain a mail fraud conviction." United States v. Goss, 650 F.2d 1336, 1343 (5th Cir. 1981).

■ It is true the government, suspicious of the activities occurring at Treasure Isle, had begun its investigation into the fraudulent activity prior to the issuance of these three checks, but this does not establish "legal" knowledge of the fraud. "There is a wide disparity between 'suspicion' and 'knowledge'." Nowlin v. United States, 328 F.2d 262, 264 (10th Cir. 1964) (citing United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946)).[38] Many investigations require maintenance of the status quo pending a determination of

or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1341 (1976).

**37.** The National Stolen Property Act provides:
Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any traveler's check bearing a forged countersignature; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.
18 U.S.C. § 2314 (1976).

**38.** We note the cases relied on by the government deal with the transportation of forged checks under 18 U.S.C. § 2314. See, e.g., United States v. Carter, 401 F.2d 748 (3d Cir. 1968), cert. denied, 393 U.S. 1103, 89 S.Ct. 905, 21 L.Ed.2d 797 (1969). We find them persuasive to our consideration of this issue.

the breadth and scope of the criminal activity. In this case, the government had been alerted to the sample switching, it had inspected the shrimp, but it had not yet explored the boundaries of the fraud perpetrated by the appellants.

In evaluating the sufficiency of the evidence we are, of course, required to view the evidence in the light most favorable to the government. *United States v. Glasser*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Under the circumstances of this case, we are unwilling to find fault with the government's tactics for flushing out the various facets of the elaborate scheme to defraud the United States prior to altering the status quo by withholding payments to Treasure Isle. Nor are we willing to require less than a practical, meaningful knowledge of the scope of the illegal activity before an allegation of fraud loses its vitality.

Counts five through fifteen and twenty-two through thirty-two fall under a different attack. The appellants submit the government failed to establish that each of the eleven contracts connected to the invoices and checks listed in the indictment were part of the scheme to defraud. Absent an individual nexus with each contract, they argue the evidence "was insufficient to prove the specific allegations of fraud."

In order to satisfy appellant's conception of sufficiency, they argue it was necessary for the government to prove the shrimp in each of the eleven contracts was nonconforming, and that the evidence showed the defects (shells, veins, and black spots) substantial enough to render the shrimp nonconforming. According to appellants, the government failed to meet its burden. To support their position, they set forth testi-mony which they contend must have placed reasonable doubt in the minds of the jurors.[39]

A conviction for mail fraud (counts five through eighteen) requires proof of: (1) the defendants' participation in a scheme to defraud; (2) use of the mails to implement the scheme; and (3) that a person connected with the scheme used or "caused" the use of the mails. *United States v. Rodgers*, 624 F.2d 1303 (5th Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Bethea*, 672 F.2d 407 (5th Cir. 1982); *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Under these counts, the government presented evidence from which the jury found the defendants guilty of the offenses beyond a reasonable doubt. Evidence showed several means employed by the defendants to include nonconforming shrimp in orders for the military. The inspectors testified that they had received gratuities from the defendants. Inspector Davis recounted to the jury his altering of the inspection reports to reflect the shrimp's conformance, when, in fact, he had previously rejected the shrimp as nonconforming. Inspector Klopp testified about his discovery of the switching scheme. And finally, the test results of the target production lots demonstrated the nonconforming quality of the shrimp produced by the defendants. We find this evidence sufficient to support the jury's verdict on all elements of the offenses charged.

The appellants suggest the facts and evidence in this case mirror those of *United States v. Herberman*, 583 F.2d 222 (5th Cir. 1978). *Cf. United States v. Zicree*,

---

39. For example, they rely on testimony of a military inspector stationed at Treasure Isle in 1975, who had independently marked sample boxes, tested them, and found them to conform to the requisite specifications. Inspector Klopp also testified that he had placed special marks on the boxes in December, 1977, and the next day had found the boxes to possess the same markings. Appellants submit this testimony negates the government's position that the switching of samples occurred during every production lot and must necessarily have placed reasonable doubt in the minds of the jurors. However, they might just as easily have inferred that the Treasure Isle employees were successful in their tampering on certain occasions. They also point out that if the switching occurred each and every time, then none of the samples tested would have contained defects, but that records demonstrated numerous times in which samples had been logged as nonconforming.

605 F.2d 1381 (5th Cir. 1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). In *Herberman*, the court found testimony from a doctor's patients and "general testimony of the investigators" insufficiently tied to "certain" counts in the indictment to sustain the defendant's conviction of them. The court isolated individual counts of submitting false medicare claims, evaluated the evidence as to each, and found the evidence insufficient on four distinct charges. Unlike *Herberman*, this case does not present eleven separate instances of fraud; it presents us with an all-encompassing scheme to defraud which affected the eleven contracts set forth in the indictment. The government was not required to link each contract to specific testimony concerning the nonconforming quality of the shrimp. Rather, its burden consisted of providing sufficient evidence from which "the jury could reasonably, logically, and legally infer" the defendants' participation in a scheme to defraud and use of the mails in its implementation beyond a reasonable doubt. *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir. 1978). The government met its burden and the jury performed its function having been properly instructed on the essential elements of the crime charged.

 A conviction under 18 U.S.C. § 2314 requires "(1) knowledge that certain property has been stolen or *obtained by fraud*, and (2) transporting it, or causing it to be transported, in interstate commerce." *Pereira v. United States*, 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1953). (emphasis added). Counts nineteen through thirty-two focused on the checks issued in payment of the eleven contracts and lots F6968 and F7008. We have no difficulty in find-

ing the evidence sufficient to sustain the convictions on these counts. Once the fraud had been established, the government need only have supplied evidence to prove the defendant's knowledge of the fraud and the actual transportation of the checks in interstate commerce. The evidence clearly supported the jury's verdict on these counts. The appellant's contention on this issue is without merit.

## An Assortment—RICO (Count 33)

In count thirty-three, the government charged the defendants with a violation of 18 U.S.C. § 1962(c), a subpart of the Racketeering Influenced and Corrupt Organization Act [RICO].[40] The appellants have cast three lines of attack in an attempt to persuade us to reverse their convictions and related sentencing on this count. First, Treasure Isle contends that it cannot simultaneously be the defendant and the enterprise under RICO.[41] Second, the appellants argue the government failed to prove the enterprise was conducted "through" a pattern of "racketeering activity." And third, the appellants assert the cumulative sentences imposed for the "pattern" offenses and the RICO count violate the double jeopardy clause.

We have exhausted the plethora of case law on RICO and the numerous interpretations of its statutory language, but find no express prohibition of Treasure Isle's dual role in the present case. Thus, for the reasons articulated below we hold that a corporation can simultaneously be named as a defendant *and* satisfy the "enterprise" requirement under RICO. We further find sufficient evidence to establish that its affairs were conducted "through" a pattern

**40.** 18 U.S.C. § 1962(c) (1976) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**41.** The indictment charged the defendants as "being employed by and associated with an enterprise engaged in and the activities of

which affected interstate commence [sic], to wit: Treasure Isle, Inc., conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity...." Record, vol. XCVII, at 13. The Appellant contends that since it is legally impossible for a corporation to conspire with itself, it is also impossible to associate with itself. Unfortunately for the appellant, our disposition of the intracorporate conspiracy issue destroys its premise.

of "racketeering activity." And lastly, we find the appellants' double jeopardy claim without merit.

*(1) The Shark*—"The Enterprise Element"

The Racketeering Influenced and Corrupt Organizations Act was passed as part of the Organized Crime Control Act and has been labeled as "a carefully crafted piece of legislation." *Ianelli v. United States*, 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975), *quoted in United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1316 (7th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). Its primary purpose was "to eradicate organized crime and corruption." *Id.* at 1317. While government prosecutors may not initially have made active use of the statute, it has subsequently become a formidable weapon in the government's arsenal to wage war against crime. *See United States v. Anderson*, 626 F.2d 1358, 1364 n.8 (8th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) (citing Atkinson, "Racketeer Influenced and Corrupt Organizations," 18 U.S.C. § 1961–68: Broadest of the Federal Criminal Statutes, 69 J.Crim.L. & Criminology 1, 3 n.21 (1978). With the government's increased use of RICO has come countless variations of attacks on its constitutionality and interpretation of its language. Foremost among the questions of interpretation is the scope to be given the term "enterprise." [42] The appellants concede that the corporation satisfies the "enterprise" requirement, but contend it cannot also be named as a defendant.

Under 18 U.S.C. § 1962(c) the government must prove: "(1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the defendant 'associated with' the enterprise; (3) that the defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. . . ." *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir. 1981).

Recently, in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the United States Supreme Court reemphasized the separate and distinct identity of two RICO elements, the "enterprise" and the "pattern of racketeering activity." The Court read the statute broadly to include wholly illegitimate "enterprises" within its purview. If it were to do otherwise, "[w]hole areas of organized criminal activity would be placed beyond the substantive reach of the enactment." *Id.* at 589, 101 S.Ct. at 2532. Congress, itself, directed a liberal construction of the act "to effectuate its remedial purposes." Organized Crime Control Act of 1970, Pub.L.No. 91–452, Title IX, § 904, 84 Stat. 941 (1970).

Requests for a more limited interpretation have been made by defendants in attempts to find certain associations or entities outside the purview of the statute. Prior to *Turkette*, the Circuit Courts of Appeals were flooded with defendants who argued that illegitimate associations did not satisfy the "enterprise" requirement. *See, e.g., United States v. Thevis*, 665 F.2d 616 (5th Cir. 1981); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Errico*, 635 F.2d 152 (2d Cir. 1980); *United States v. Provenzano*, 620 F.2d 985 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980); *United States v. Sutton*, 642 F.2d 1001 (6th Cir. 1980) (en banc), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 995 (1981); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Zemeck*, 634 F.2d 1159 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *United States v. Swiderski*, 593 F.2d 1246 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979) (dictum).

---

**42.** The Second Circuit Court of Appeals first dealt with the scope of the term "enterprise" in *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

Other courts have been confronted with the issue of whether the term "enterprise" encompasses various entities. *See, e.g., United States v. Thompson,* 669 F.2d 1143 (6th Cir., 1982) (does not encompass the office of the Governor of the State of Tennessee); *United States v. Angellili,* 660 F.2d 23 (2d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982) (encompasses the state civil court); *United States v. Long,* 651 F.2d 239 (4th Cir.), *cert. denied,* 454 U.S. 896, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (encompasses the state senate seat); *United States v. Clark,* 646 F.2d 1259 (8th Cir. 1981) (encompasses the office of county judge).

Still, other courts have wrestled with allegations of failure to submit proof of an enterprise distinct from the evidence submitted as proof of a pattern of racketeering. *United States v. Bledsoe,* 674 F.2d 647 (8th Cir. 1982); *United States v. DeRosa,* 670 F.2d 889 (9th Cir. 1982); *United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1981); *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981).

None of these cases, nor any others uncovered in our search, have squarely dealt with the issue now before us. We are presented with a situation in which the entity clearly satisfies the "enterprise" requirement, and may clearly be a defendant. The question is whether the same entity can be both simultaneously.

Section 1961(4) of Title 48 defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1976). Not even the appellants contest the inclusion of Treasure Isle within the literal reading of the statute. This relieves us of the arduous task of statutory interpretation, but does not resolve the issue.

Section 1962(c) prohibits "any *person* employed by or associated with any enterprise" from committing the proscribed conduct. 18 U.S.C. § 1962(c) (1976). " '[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (1976). Clearly Treasure Isle fits this definition.

■ Considering the broad reading given the term "enterprise" in *Turkette,* the Court's willingness to expand the scope of RICO's application, and absent any prohibition of Treasure Isle assuming a dual role, we answer our inquiry in the affirmative. A corporation may be simultaneously both a defendant and the enterprise under RICO.

Appellants suggest that if we allow the conviction to stand, we have "effectively eliminated" the enterprise element from section 1962(c). This simply is not true. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 452 U.S. at 583, 101 S.Ct. at 2528. The Fourth Circuit Court of Appeals suggested a form of proof for satisfaction of the enterprise element if a corporation was named as the enterprise. "Presumably . . . it would involve proof simply of the 'legal' existence of the corporation. . . . Neither the actual nor ostensible purpose of such an enterprise would seem directly relevant to proof of a RICO violation. . . ." *United States v. Griffin,* 660 F.2d 996, 999 (4th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982) (dictum). Thus, it would appear that evidence of Treasure Isle's corporate existence would supply the requisite proof of the enterprise element, a separate and distinct burden in satisfaction of the Supreme Court's mandate in *Turkette.*[43]

---

**43.** Appellants complain that Treasure Isle's corporate status, allowing for the government's alleged "emasculation of the enterprise element," is "particularly grievous" in view of the doctrine of corporate liability. Since a corporation is liable for the acts of its agents and employees, it permits an employee's activities to serve as proof of the two predicate acts

We are further persuaded of the soundness of our decision by the logic propounded by the government and the dictates of common sense. The government hypothesizes that if an individual were named as the enterprise,[44] and a group of persons engaged in a pattern of racketeering with that individual, it would defy reason to suggest that the central figure (the enterprise) could not also be prosecuted under RICO. We agree.

The government also suggests, and the defendants concede, this problem would never have surfaced had it charged the defendants collectively as an "association in fact" and charged Treasure Isle singly as the enterprise. This is reminiscent of the old adage, "a rose by any other name." "There is no distinction, for 'enterprise' purposes, between a duly formed corporation that elects officers and holds annual meetings and an amoebalike infra-structure that controls a secret criminal network." *United States v. Elliott*, 571 F.2d at 898. In fact, the former Fifth Circuit in discussing the distinction between a "legal entity" or a "group of individuals associated in fact although not a legal entity," has stated "there is no logical or statutory reason to force the government to choose between alternative enterprise theories . . . as long as the indictment is otherwise sufficient." *United States v. Stratton*, 649 F.2d 1066, 1075 (5th Cir. 1981).[45] Had the government elected to charge the defendants in this manner, it would certainly have alleviated this lengthy discussion. Regardless, as long

as the "enterprise" is established as an independent element under RICO, we perceive no problem with the form of the indictment in this case.

A third plausible rationale can be derived from basic corporations law. Although a corporation is a distinct legal entity, "[i]n rare, special circumstances, . . . courts will 'pierce the corporate veil'. . . ." *FMC Finance Corp. v. Murphree*, 632 F.2d 413, 421 (5th Cir. 1980). We do not intend to analyze this issue under corporate doctrines, but by analogy Treasure Isle, Inc., can be dissected and viewed in a different light for each of the roles it assumes in this case. As a defendant, it can maintain its separate legal status as an ongoing business venture. By piercing through this sterile exterior, however, it can be revealed as an association of employees, officers, and agents working as a unit to effectuate a common purpose—to defraud the government. Viewed in this manner, it takes the form of a "group of individuals associated in fact," or in the words of the Court, "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583, 101 S.Ct. at 2528. Evidence of its ongoing nature, and "that the various associates function as a continuing unit" satisfies the enterprise element of RICO. *Id.* Treasure Isle's problem lies in the fact that its corporate structure admits the characteristics essential to the formation of an association in fact—a fate which renders its argument concerning the elimination of the enterprise element nugatory.[46]

---

required by section 1962(c). This is simply a reality to be faced by corporate entities. With the advantages of incorporation, must come the appendant responsibilities.

**44.** 18 U.S.C. § 1961(4) includes an individual in its definition of an enterprise. *See also United States v. Elliott*, 571 F.2d 880, 898 n.18 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

**45.** The Eleventh Circuit sitting en banc adopted the law of the Fifth Circuit as it existed on September 30, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

**46.** We note *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125 (E.D.Va.1981), in

which the District Court held that a corporate subdivision did not satisfy the enterprise requirement of RICO.

An unincorporated "division of a corporation is not a separate entity, but is the corporation itself." It is clear, then, that the Infonet Division is not "an individual, partnership, corporation, association, or other legal entity." At *most*, the division is "a group of individuals associated in fact although not a legal entity." However, even if it is such a group of individuals associated in fact, CSC, by definition, could not be included in this association. Section 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." It is clear from the definition that

It would be anomalous indeed if the mere format chosen by the government could circumvent the proper application of RICO to the case presented. We refuse to allow this to happen. We hold that a corporate defendant may simultaneously be named in the indictment as the enterprise through which defendants conduct a pattern of racketeering.

**(2) The Barracuda—"Through a Pattern of Racketeering"**

The appellants' second attack upon the validity of the RICO conviction concerns the government's proof that the corporation conducted its affairs "through" a pattern of "racketeering activity." They assert the government improperly charged the defendants with violation of RICO when the evidence merely proved "a series of violations of the False Claims Act...." [47]

■■■ As can be seen by a reading of our analysis of the appellants' sufficiency of the evidence claims regarding the predicate acts of mail fraud and violations of the National Stolen Property Act,[48] the government met its burden of proof. Mail fraud and the interstate transportation of fraudulently obtained property are specifically enumerated in the definition of racketeering under RICO.[49] Thus, by providing sufficient evidence of the two predicate acts, the government proved the existence of "racketeering activity."

"Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1978). Absent an assertion of discrimination, and in consideration of the sufficiency of the evidence, we fail to perceive any constitutional violation in the government's prosecution of these defendants under RICO.[50]

The appellants additionally assert that section 1962(c)'s requirement that an enterprise conduct its affairs "through" a pattern of racketeering activity requires proof that the enterprise benefitted economically from the illegal activity. They rely on *United States v. Webster*, 639 F.2d 174 (4th Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) in support. However, upon rehearing, the Fourth Circuit retracted the essential language upon which the appellants base their argument.

> Unfortunately, we introduced "promoted", "improved", "advanced" and "benefitted", as practical synonyms for "conducted", influenced, no doubt, by the consideration that the enterprise ... was organized for profit.
>
> ....
>
> The proper question should have been whether the affairs of the 1508 Club were

"individual" is used differently from "person" in the act to connote a living person. *Id.* at 1131 (citations omitted).

**47.** Brief for Appellant, Treasure Isle, Inc., at 58.

**48.** *See* text of opinion accompanying notes 38–39 *supra*.

**49.** 18 U.S.C. § 1961(1) (1976) provides in pertinent part: " '[R]acketeering activity' means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), ... [and] sections 2314 and 2315 (relating to interstate transportation of stolen property)...."

**50.** The appellants rely on *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125 (E.D. Va.1981), to support their theory that evidence of false claims does not support prosecution under RICO. *See* Brief for Appellant Treasure Isle, Inc., at 59. We have reviewed the opinion

cited and unlike the case before us the defendants in *Computer Sciences* were charged with *both* false claims and mail fraud based on the same acts of sending invoices and receiving government checks in payment of them. While the claims did not violate double jeopardy under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), due to the additional element of "mailing," the District Court did find that the more specific statute (false claims) provided the appropriate vehicle for prosecution. We are not presented with the same problem since in this case, the government elected to pursue one statutory scheme, mail fraud and correspondingly the transportation of property obtained by fraud. In addition, the Supreme Court authority relied on by the District Court in *Computer Sciences* concerned statutes involving enhancement provisions for use of firearms and additional prosecution under a separate firearms statute.

*conducted* through the pattern of racketeering activity, not whether they were benefitted or advanced or whether profit to the 1508 Club resulted.

*United States v. Webster*, 669 F.2d 185, at 186 (4th Cir. 1982).

The former Fifth Circuit encountered an identical attempt by defendants to rewrite the RICO statute to include a requirement of benefit or advancement in *United States v. Welch*, 656 F.2d 1039 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982). The Fourth Circuit's original panel opinion in *Webster* again provided the source for the argument. The Fifth Circuit found "the reasoning of the Fourth Circuit, and its interpretation of the word 'through,' to be unduly restrictive." *Id.* at 1060–61. Citing an earlier Fifth Circuit opinion, *United States v. Martino*, 648 F.2d 367 (5th Cir. 1981), the court held "that by the use of the word 'through,' Congress intended *only* to require a sufficient nexus between the racketeering activities and the affairs of the enterprise." 656 F.2d at 1062 (emphasis supplied).

 Under this standard and the facts presented, we have no difficulty in finding a sufficient nexus between the deceptive activities employed by the defendants in the inspection of the breaded shrimp and the common everyday affairs of the enterprise—the production of breaded shrimp. By establishing this nexus, the government met its burden of proving conduct "through" a pattern of racketeering activities.

(3) *The Grouper*—"Double Jeopardy & Cumulative Sentencing"

The District Court imposed fines totalling $167,000 on Treasure Isle for its conviction on the first thirty-two counts. In addition, a special condition of performing community service was imposed under count thirty-three, the RICO violation. Treasure Isle now complains that 18 U.S.C. § 1963 limits fines for violations of § 1962 to $25,000 and that the additional amount imposed for conviction of the predicate acts violates the double jeopardy clause of the United States Constitution. We find its position untenable.

The United States Supreme Court recently articulated the analysis to be applied to statutory schemes in order to evaluate them for double jeopardy purposes. *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). First, the courts should apply the *Blockburger* test to determine whether "the same act or transaction constitutes a violation of two distinct statutory provisions...." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). "[T]he test to be applied to determine whether there are two offenses or only one is whether *each* provision requires proof of a fact which the other does not." *Id.* (emphasis supplied). If it is determined that the two statutory offenses are distinctly different, then the sentences may run consecutively. However, "where the offenses are the same under that test, cumulative sentences are not permitted, unless elsewhere specially authorized by Congress." 445 U.S. at 693, 100 S.Ct. at 1439. "The dispositive question, therefore, is whether Congress did so provide." *Id.* at 1436.

 At first blush it would appear that the predicate offenses and the RICO violation run afoul of the *Blockburger* test.[51]

---

**51.** We note the former Fifth Circuit discussed, but did not rule on, *Blockburger's* applicability in *United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981). The court distinguished predicate acts under RICO from the "traditional greater and lesser included offenses", which had been the subject of the recent Supreme Court opinion in *Whalen.*

Although we recognize that it might be argued that the "same act or transaction" requirement of *Blockburger* should, as in cases involving traditional greater and lesser included offenses, simply be interpreted as coextensive with the scope of the predicate offense, we need not decide this question. It is enough to conclude that, in light of the clear intent of Congress to authorize cumulative punishments for substantive RICO offenses and the underlying predicate crimes, *Blockburger*, which simply is a tool for divining Congress' intent in the absence of other evidence, does not compel a contrary result. *Id.* at 288.

Conviction under RICO does require "proof of a fact" not required by conviction of the predicate acts; namely, the existence of an enterprise. The predicate offenses, however, fail to possess the requisite "additional element" to satisfy the edict of *Blockburger*. However, "the *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981). We find such a "clear indication" of legislative intent within the statutory framework of RICO. *United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981). As that court noted, Congress articulated its intent to permit cumulative sentencing when it stated:

> It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing *new penal prohibitions*, and by providing *enhanced sanctions and new remedies* to deal with the unlawful activities of those engaged in organized crime.

Organized Crime Control Act of 1970, Pub. L.No.91–452, 84 Stat. 923 (1970) (emphasis supplied). Additional support may be found in section 904(b), which states that "[n]othing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title." Pub.L. 91–95, § 904(b). Indeed, the definition of racketeering activity enumerates in some detail the specific crimes which may be used to establish this element for purposes of a RICO conviction. Surely, Congress could not have meant to eliminate the penalties for these crimes by incorporating them as evidence of a more organized method of committing crime. In our opinion, the Congressional intent is clear.

The District Court properly imposed cumulative sentencing for RICO and the underlying predicate offenses.[52]

### Returning to Port

Appellants' fishing expedition has come to an end. The defendants' hooks were baited with too much bread and not enough shrimp. The big fish (government) wasn't fooled. All convictions and sentences are AFFIRMED.

---

**52.** *See United States v. Rone*, 598 F.2d 564 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); and *United States v. Boylan*, 620 F.2d 359, (2d Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). *See also* discussions on double jeopardy and related RICO issues in *United States v. Dean*, 647 F.2d 779 (8th Cir. 1981); and *United States v. Barton*, 647 F.2d 224 (2d Cir. 1981).